IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Enrique Seoane-Vazquez, | : | |
| Plaintiff | : | Civil Action 2:10-cv-622 |
| v. | : | |
| The Ohio State University, | : | Magistrate Judge Abel |
| Defendant | : | |

# Opinion and Order

This matter is before the Court on the motion of Defendant The Ohio State University ("OSU") for summary judgment (Doc. 76).

**Overview.** Dr. Seoane-Vazquez initially filed suit alleging that The Ohio State University discriminated against him in his employment as an assistant professor in the College of Pharmacy because of his Hispanic national origin. There were also claims for retaliation and discrimination by association. While that lawsuit was pending, the Promotions and Tenure Committee of the College of Pharmacy voted on whether to grant Seoane tenure. Only seven of the 21 faculty attending the ballot meeting, well-short of the two-thirds vote needed, voted to confer tenure. Shortly after, he dismissed that lawsuit. When he filed the complaint here, the statute of limitations had run on the claims pleaded in the first lawsuit. The amended complaint here alleges that OSU retaliated against Dr. Seoane when the Provost made the final decision to deny him tenure.

The amended complaint alleges that the Dean of the College of Pharmacy, the Chair of the College of Pharmacy, Division Pharmacy Practice and Administration, where Seoane taught, and a coworker, Dr. Rajesh Balkrishnan retaliated against him because he exercised his right to file complaints with OSU and the EEOC about their discrimination against him because of his national origin and their retaliation against him for filing the complaints. Although these three actors played a role in the events leading up to and including the faculty vote to deny him tenure, that decision and the Dean's recommendation were not the final actions of OSU. The decision to deny tenure was made by OSU Provost Joseph Alutto, who took no part in the alleged discriminatory or retaliatory conduct and conducted his own review of the tenure recommendations made by the faculty and dean. Ultimately, the question for decision is whether Plaintiff has offered evidence from which a reasonable trier of fact could conclude by a preponderance that the dean, the chair, and Balkrishnan engaged in retaliatory acts intended to cause and that were, in fact, a proximate cause of Alutto's decision to deny Seoane tenure. For the reasons set out below, I conclude that he has not.

## I.     Factual and Procedural Background

The following facts are drawn from the parties' pleadings and briefs and the attached exhibits and depositions, and are, unless otherwise noted, not in dispute.

### A.     Dr. Seoane's Position at OSU

Dr. Enrique Seoane-Vazquez ("Seoane"), a native of Spain, was hired as an assistant professor in OSU's College of Pharmacy ("COP") in August 2002, serving

2

in the Division of Pharmacy Practice and Administration ("PPAD") with an additional unpaid appointment in the College of Public Health ("COPH").  In 2004, Seoane was appointed by the chair of PPAD, Dr. Milap Nahata ("Nahata"), to serve on a search committee for a faculty position, the Merrell Dow Chair.  Dr. Nahata eventually filled the vacancy with Dr. Rajesh Balkrishnan ("Balkrishnan"), a person, like Nahata, of Indian origin.  Seoane had expressed concerns to Nahata about Balkrishnan's candidacy, in part because Balkrishnan had told him he had conflicts with other faculty at his then current position at the University of Texas and in part because he believed there were two better qualified internal candidates for the position. (Seoane Dep., pp. 187-91, and 197, Doc. 69, PageID 8320-23.)

Plaintiff alleges that Nahata and Balkrishnan then began discriminating and retaliating against him through various means, including attempting to convince his graduate students not to work with him or take his classes, attempting to convince graduate students of Indian ancestry that they should be working with fellow Indians instead of him, appointing Balkrishnan to present Seoane's annual review, and attacking other faculty who defended him or supported any of his claims.

In August 2005, Seoane submitted a complaint of violation of University harassment and anti-discrimination policies to Dr. Robert Brueggemeier ("Brueggemeier"), the dean of the college.  Brueggemeier referred the complaint to the college's investigative committee, which found some of his allegations to have merit and recommended further investigation.  Brueggemeier, however, issued a final

decision finding that no further investigation needed to be conducted.  Seoane then asked OSU's vice provost to review the matter, but she declined.  A subsequent investigation by OSU Human Resources resulted in a report finding some incidents of inappropriate conduct, but no violations of policy.  Seoane appealed these conclusions to the university's vice president for human resources, who denied the appeal.  On September 6, 2006, Seoane filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") relating to these incidents.  He received a Notice of Right to Sue from the EEOC on May 9, 2007, and thereafter filed suit in this court, alleging discrimination, retaliation, and discrimination by association.  *Seoane-Vazquez v. The Ohio State University*, Case No. 07-775.

    B.    **Tenure Review Process at COP**

    During the pendency of that suit, Seoane underwent OSU's five-stage tenure review process. O.A.C. §3335-6-04(B).  First, the candidate prepares a dossier documenting his accomplishments.  Second, the COP, as tenure initiating unit, gathers internal evidence of the candidate's quality of teaching and research, a letter from the division chair about the quality of his academic performance, and letters from evaluators outside the university concerning the candidate's work, adding this information to the dossier.  The Promotion and Tenure Committee ("P&T Committee").  Third, the dossier is submitted to eligible faculty for review and a ballot meeting is held, at which a member of the P&T Committee presents the candidate's application.  Faculty eligible to vote on tenure comprise all persons at a higher academic rank than the candidate, except for the dean.  For tenure to be

4

recommended, two-thirds of the faculty present must vote to confer tenure. After the meeting, the chair of P&T Committee prepares a report and assessment, including the results of the vote, which is sent to the Dean of COP. Fourth, the Dean prepares a separate written assessment, which is added to the dossier. The candidate is notified in writing of the availability of the reports, and then has the opportunity to provide the COP with written comments for inclusion in the dossier. If the candidate does so, the Dean may include a written response. Finally, the dossier is submitted to the Provost, who may, where questions about the appropriateness of lower level recommendations exist, or where all previous recommendations are negative, obtain advice from the university-wide Faculty Promotion and Tenure Committee. The Provost then renders his decision, which is binding on the university's Board of Trustees.

Where a candidate believes that a negative promotion and tenure decision has been made improperly, O.A.C. §3335-6-05(A) provides that he may file a complaint with the University Committee on Academic Freedom and Responsibility ("CAFR"). CAFR reviews the complaint, and either dismisses it or finds that reasonable and adequate grounds exist for asserting improper evaluation. In the latter case, CAFR forwards the complaint to the Faculty Hearing Committee ("FHC"[1]). FHC selects a panel and conducts a hearing on the validity of the

[1]Plaintiff's counsel refers to the Faculty Hearing Committee and the FHC Hearing Panel throughout as the "UHC." This Opinion and Order will refer to these entities as the FHC.

complaint, determining only whether the decision-makers followed appropriate procedures and fairly considered the evidence, not whether the decision-makers reached the correct conclusion as to the merits of the candidate.  O.A.C. §3335-5-05(A)(4).  The panel can then either dismiss the complaint or submit its findings to the dean of COP, the executive vice president, and provost.[2]

### C.    Seoane's Tenure Review

Under OHIO ADM. CODE § § 3335-6-04(B)(3):

> The tenure initiating unit chair or chair of the promotion and tenure committee shall also be responsible for obtaining letters from external evaluators and from other units at this university in which the candidate has appointment or substantial professional involvement, whether compensated or not.  Some of the external evaluators should be suggested by the candidate and some by the department chair or promotion and tenure committee; no more than one-half of the letters contained in the final dossier should be from persons suggested by the candidate.  All solicited letters that are received must be included in the dossier.  Unsolicited letters of evaluation or letters of evaluation solicited by anyone other than the above authorized persons may not be included in the dossier.

At the outset of the tenure review process, Nahata emailed Seoane to obtain suggested external reviewers.  Seoane responded:

> Investigations . . . found clear evidence that faculty from the College of Pharmacy made unsolicited and inappropriate comments about my performance as an assistant professor to other faculty members of the Ohio State University and other universities.  The extent of those unsolicited and inappropriate comments is still under discovery.  Therefore, I cannot offer at this time acceptable alternatives for external evaluators that can provide a fair and unbiased review of my tenure dossier.  Furthermore, the Office of Academic Affairs does not require

---

[2] The nature of FHC review is addressed *infra* at III.  Joseph Alutto ("Alutto") is both the executive vice president and provost of OSU.

that the dossier contain letters from persons suggested by the
candidate. . . .

(Alutto Declaration, Ex. C, p. 1, Doc. 77-2, PageID 11036.)  According to Dr. Buerki
("Buerki"), one of the P&T Committee members, the senior faculty members in the
division met and came up with a list of fifteen potential external reviewers from
other universities.  Nahata attended the meeting and took notes, but recused
himself from offering any names.  Buerki sent requests to all fifteen.  The list of
potential external reviewer names was furnished to Seoane after COP sent the
requests.  It took some time to gather responses; at one point Buerki solicited
additional reviewer name suggestions from Dr. Dembe of COPH.  (Buerki Dep., Ex.
345, pp. 5-6, Doc. 64-15, PageID 7117-18.)  Eventually, Drs. Brooks, Shepherd, Hay,
Kreling, and Mullins, of various other universities, sent letters.  Buerki testified
that he and Nahata were concerned that only five letters had come in, as COP rules
required that the dossier contain at least six external evaluator letters.  (Buerki
Dep., p. 136, Doc. 64, PageID 7051.)  Buerki then sent out another request for
letters.  In addition, Nahata, apparently acting on the advice of university legal
counsel, recused himself from preparing the Division Chair letter ("Chair letter"),
and Buerki prepared it instead.  (Buerki Dep., p.221, Doc. 65, PageID 7174.)
Buerki's October 10, 2008 Chair letter included excerpts and commentary from the
external review letters of Brooks, Shepherd, Hay, Kreling, and Mullins.[3] (Alutto

---

[3]  Kreling's external review letter was almost entirely negative on various
topics such as Seoane's rate of publication and research focus.  It also contained
what is apparently an unusually harsh criticism of Seoane's scholarship as

Dep. Ex. 2, pp. 2-4, Doc. 38-7, PageID 1569-71.)

Seoane then met with Buerki to discuss his dossier, which Buerki was to present at the upcoming faculty ballot meeting. Seoane wrote a November 29, 2008 letter to Buerki rebutting what he saw as errors or exclusions in the Chair letter, as well as allegations of unfair treatment, and requesting that Buerki distribute his letter at the faculty ballot meeting. (Buerki Dep., Ex. 346,Doc. 64-16, PageID 7133-35.) Buerki emailed Seoane, agreeing to distribute his letter. (*Id.,* Ex. 345, p. 20, Doc. 64-15, PageID 7132.)

Several events took place during and around the faculty ballot meeting.[4] A sixth external evaluator letter, from Dr. Hartzema, had eventually arrived. However, on the same day as the ballot meeting, a seventh external letter, from Dr. Gaither, arrived as well.[5] Buerki distributed some copies of Gaither's letter at the meeting. In addition, a lengthy discussion took place at the outset of the meeting as to whether it was proper for Buerki to distribute Seoane's November 29, 2008 meeting letter. Dr. Young, the chairman of the COP P&T Committee, decided not to distribute the letter, stating that the tenure process rules did not permit a

---

"mediocre at best." (Alutto Dep., Ex. 3, Doc. 39-6, PageID 2507-09.)

[4] Plaintiff requested a temporary restraining order enjoining the university from proceeding with his faculty ballot meeting, but this request was denied. *Seoane-Vazquez v. The Ohio State University*, S.D. Ohio Case No. 07-775, Doc. 22 (November. 26, 2008).

[5] Under O.A.C. §3335-6-04(B)(3), "[a]ll solicited letters that are received must be included in the dossier."

candidate to submit comments until after the faculty ballot meeting.[6]

During the tenure meeting, Balkrishnan asked, "I would like to know if we have some type of legal immunity given the fact that there is – there are issues over here, if we candidly assess the candidate, do we have protection from Ohio State University for providing candid assessments." (*Id.*, p. 60, PageID 10668.) Dean

---

[6] At deposition it was discovered that Dr. Wientjes of COP made an audio recording of the ballot meeting, and a transcript of this meeting has been filed. (Defendant's December 16, 2011, Motion Summary judgment, Doc. 76, Ex. N, Transcript from Audio Recording, Doc. 76-19, p. 60, PageID 10608-10728.)  The parties both seem satisfied that it is accurate.  (Doc. 76 at fn 10; Doc. 94 at 41.)

According to the transcript, the discussion concerning the distribution of Seoane's rebuttal letter ended with the following exchange:

> Dr. Tjarks:  Well, the Dean has kind of explained the rules and regulations in this matter.  If there should be concerns and then these concerns come to the table in 14 days, then the rebuttal letter will be discussed.  So I don't know what the point is.  I think we have to go on at this point in time.  If there are concerns, there's a rebuttal letter that will come on the table in 14 days.  It's as simple as that.
>
> Dr. Young: Bob Curley?
>
> Dr. Curley: Yeah, I was about to say virtually the same thing.  I'm moving on with this.  And if we don't, or we decide that we are going to violate our rules, I know one person who's leaving the room.  And I hope we fall below the quorum, then, because I've had it listening to this nonsense.  Sorry.
>
> Unidentified Speaker: I'm thinking that I would leave the room, too.
>
> Dr. Young: Are we ready to move on, then?
>
> Multiple Unidentified Speakers: Yes. Yes.

(Defendant's December 16, 2011, Motion Summary judgment, Doc. 76, Ex. N, Transcript from Audio Recording, Doc. 76-19, pp. 79-80, PageID 10686-87.)

Brueggemeier told him that if he was acting in accordance with University guidelines and sticking to the facts he did. (*Id.*) Balkrishnan later said:

> Dr. Seoane-Vazquez has implicated me and several other faculty members over the past four years in accusations of research theft and retaliation which have been thoroughly investigated by committees within the college as well as independent committees at the university, as well as the Equal Employment Opportunities Commission had have been found to be without merit. You may want to take into account all these attributes when you make a decision for tenure of a candidate in a Top 5 institution in pharmacy. I would only say that much.[7]

(*Id.,* p. 84, PageID 10692.) Much later in the proceedings, Nahata made the following statement:

> I just wanted to make a couple of points. Number one, that I have been very deliberate in reviewing Enrique over the years. It has little to do with who likes who. That has never been the case. It was based on facts. Number two, in the dossier, he implicates that in 2006 that Dr. Nahata surreptitiously appropriated for himself a $50,000 grant, for which I had applied from the Ohio Department of Mental Health. I really regret to even have to say this, but this is fully false. They called me -- and I told --the first thing I told them was please call Dr. Seoane, because he had not worked with Medicaid. And they said they were aware of his work, did not want to work with him. So I went to the Dean, and I said, what are we to do here? Am I just -- they didn't want him to do the work. It was work which I have -- similar to what I had done before. He said we could do it. So the point where should I even -- what should l do? Can I even entertain that idea. And he said that was all right, they already evaluated his proposal and rejected it, that I could go to do that work. So it has nothing to do with surreptitiously taking his grant, absolutely nothing.

(*Id.,* pp. 109-10, PageID 10717-18.).

---

[7]Plaintiff asserts that these remarks refer to an OSU-HR investigation into Seoane's complaint that Nahata and Balkrishnan worked to derail his efforts to gain tenure by inappropriately taking a grant from him. Plaintiff maintains that the deposition of the person awarding the grant demonstrates that he did not tell Nahata he did not want to work with Seoane. (Doc. 94, PageID 16318.)

Dr. Jessie Au later said that the investigating committee, of which she was a member, found "something wrong" and that the complaints "cannot be just simply dismissed." (*Id.,* pp87-88, PageID 10695-96.)  After some further discussion that is set out below when discussing Incident 1, the P&T Committee voted seven votes in favor of tenure, ten against, and four abstentions.

On December 9, 2008, Young, as P&T Committee Chair, prepared a report of the ballot meeting. (Alutto Dep. Ex. 9, Doc. 38-12, PageID 1853-56.)  It contained a record of the vote and referred to various comments from faculty:

> Some College faculty voiced concern over the depth of scholarship of Dr. Seoane-Vazquez' publications.  These faculty viewed his publications as descriptive in nature and lacking sufficient analysis.  A related criticism concerned a perceived lack of focus in Dr. Seoane-Vazquez's research.  This was felt to diminish the impact of Dr. Seoane-Vazquez's efforts.  As evidenced by the letters contained in the dossier, the opinions of outside reviewers with respect to the quality and focus of Dr. Seoane-Vazquez's publications were also mixed. Additionally, some faculty and external reviewers suggested that Dr. Seoane-Vazquez had not demonstrated an ability to secure sufficient funding from competitive sources.  Again, these concerns were not universally held by the faculty.  However, they were likely to have been a major influence in reaching the final tally.
>                                    . . .
> Dr. Seoane-Vazquez has alleged improper behavior of colleagues in his division, allegations that the College Investigative Committee has examined.  While some of the allegations were found to lack merit, a committee member noted that a factual basis existed for at least some of Dr. Seoane-Vazquez's allegations.

(*Id.* PageID 1855.)  Dean Brueggemeier then prepared the Dean's Letter for the dossier. He recommended that Seoane not be granted tenure. (Alutto Dep. Ex. 9, Doc. 38-12, PageID 1857-59.)  Brueggemeier stated in his letter that Seoane's teaching was highly regarded by his students and fellow faculty, and that his level

11

of collegial service was appropriate, but that he agreed that his research was inadequate and unfocused and that he did not seem to be able to secure competitive grant funding.

Seoane was advised that his tenure review was complete, and he exercised his right to submit written comments. His January 5, 2009 comment letter was included in the dossier. (Alutto Dep. Ex. 11, Doc. 38-14, PageID 1861-75.) In his letter, he addressed the following matters in depth:

- Allegations that his Title VII claims had been used as a basis for denying him tenure, including Balkrishnan's remarks at the ballot meeting;

- The decision, which Plaintiff characterized as having been made by Brueggemeier, not to distribute his comments letter at the ballot meeting;

- Allegations that Kreling and Gaither were biased outside reviewers. Specifically, Plaintiff alleged that Kreling had been induced to write a strongly negative letter by Dr. Craig Pedersen, a former COP faculty member who had clashed with Plaintiff in prior incidents and who had collaborated with Pedersen in certain work, and that Gaither had likely been influenced as well;

- Criticisms of alleged inaccuracies and unfair characterizations in the Chair Letter, Young's ballot meeting report, and the Dean's letter, arguing that other candidates had received better treatment, and that the Chair Letter had failed to include "some of the most positive comments from the external reviewers";

- A complaint that, although Plaintiff had a joint appointment as an assistant professor with COPH, no assessment letter had been obtained from COPH to include in his dossier, and that his dossier failed to include numerous publications and presentations;

- An allegation that the appointment of Buerki to prepare and present Plaintiff's tenure case violated university rules;

- An allegation that university rules did not permit Buerki to prepare the Chair Letter in lieu of Nahata; and

- An argument generally that due to the above Brueggemeier, Nahata, Buerki, and the P&T Committee violated their duties to conduct the tenure process in a fair and professional manner.

Seoane requested that the Provost (1) restart the tenure process, in strict accordance with proper procedures; (2) inform all faculty members voting on tenure of misleading statements presented by Brueggemeier, Nahata, Balkrishnan, and other faculty; (3) include his original Meeting Letter and later Comments Letter in his dossier; (4) update his dossier to include his full record; and (5) bar Brueggemeier, Nahata, and Balkrishnan from participating in his tenure review.

Upon receiving the dossier, Provost Alutto referred it to the Faculty Promotion and Tenure Committee ("FP&T Committee"). This body, consisting of seven faculty from around the university, was headed by Dr. Carole Anderson ("Anderson"), Dean of the College of Dentistry. According to Anderson's April 7, 2009 report to Alutto, the FP&T Committee deliberated Seoane's case, finally casting five votes to strongly recommend disapproval and two to weakly recommend disapproval of granting tenure. She stated that the committee essentially agreed that Seoane's scholarship was unfocused and inadequate, and that he lacked a track record of obtaining adequate research funding. However, Anderson noted, "[i]n the course of the University Committee's deliberations, they found themselves without the investigative resources to determine the accuracy of the allegations contained in the candidate's 'Comments' to the College review." (Alutto Dep. Ex. 12, Doc. 38-15, PageID 2023-24.)

Anderson reviewed Seoane's January 5 comment letter and met with Brueg-

13

gemeier (and university legal counsel) for his response, which she set out in detail in her report to Alutto.  She stated that Balkrishnan had made comments at the ballot meeting about Seoane's Title VII claims, "but he was cut off by the chair immediately and told he was out of order," and that, despite Seoane's complaints about the objectivity of outside examiners, "he apparently did not exercise his right to question their selection before the fact."  Anderson concluded that Seoane's allegations of improprieties were without merit.  (*Id.*, PageID 2023.)

Alutto's December 14, 2011 affidavit states that he followed his usual procedures in his review of Brueggemeier's recommendation to deny Seoane tenure:

> 6.  The focus of my analysis of a tenure candidate's application is whether the applicant's academic record, which includes teaching, research, and service, merits a 30 year commitment from OSU. Among other things, I am looking at the candidate's pattern or vector of achievements as to whether the candidate has an academic record of the high-level caliber to support an award of tenure.

> 7.  In conducting a tenure review of cases when I have a concern regarding the appropriateness of lower level recommendations, when there are unclear or inconsistent recommendations from previous levels of review, or when all previous recommendations are negative, I personally review the candidate's complete tenure file ["OAA File" or "dossier"], which includes the core dossier prepared by the candidate.  I conduct my own independent assessment of the complete tenure file.  My review takes quite a long time, as I take this responsibility very seriously.  I personally read and consider the candidate's core dossier, the external reviewers' letters, and all of the votes below on the candidate.  My review also includes the other materials in the OAA File including the candidate's comments (if any), the chair letter, the chair of the TIU promotion and tenure committee letter, the dean's letter setting out the achievement and recommendation regarding the candidate, and the vote of the University Promotion and Tenure Committee and report and recommendations from the vice-Provost convenor (if any).

14

. . .

13. In Dr. Seoane's case, I very carefully reviewed and considered his Candidate's Comments and I independently evaluated his concerns in the context of the dossier. Specifically, I considered and evaluated the following:

a. Dr. Seoane's allegation regarding Dr. Balkrishnan's statement in the Ballot Meeting regarding the EEOC. . . .

b. Dr. Seoane's allegation regarding the Dean's refusal to distribute a November 30, 2008 letter from Dr. Seoane to all of the faculty at the Ballot meeting. . . .

c. Dr. Seoane's allegations regarding biased external reviewers. . . .

d. Dr. Seoane's allegations that letters drafted by Dean Brueggemeier, Nahata, Buerki and Young contained false statements, misstatements, and omissions. . . .

e. Dr. Seoane's allegations that the COP faculty were presented with an incomplete dossier. . . .

(Doc. 77, PageID 10870-74.) At the conclusion of his review, Alutto stated, he decided not to award tenure to Seoane "based solely on Dr. Seoane's academic record and performance." (*Id.,* PageID 1074.)

Seoane then filed a complaint with the University Committee on Academic Freedom and Responsibility ("CAFR"), setting forth substantially the same allegations as in his January 5 comment letter. (Doc. 52-29.) After conducting an investigation, including interviewing Seoane, on June 28, 2009 Marilyn Blackwell, Chair of CAFR, reported that the Committee found, *inter alia*, that there was some reason to think that Kreling and Gaither were not in a position to provide unbiased external reviews, that COP should have furnished Seoane with the list of proposed external reviewers before they were contacted for letters, that Nahata should have found someone other than Buerki to assist him in writing the Chair letter, and that

15

COPH should have supplied Seoane with a letter of evaluation. (Kinghorn Dep., Ex. 478, Doc. 50-41, PageID 4155-67.)

CAFR passed Seoane's appeal on to the Faculty Hearing Committee ("FHC"), which met six times, reviewing Seoane's CAFR complaint and relevant written materials, and interviewing Plaintiff, Brueggemeier, and Buerki. (Doc. 70-18.) In its written report to Provost Alutto, FHC addressed each of Seoane's allegations at length, and concluded:

> By unanimous vote, we concluded that the appropriate procedures were followed, the important evidence was considered for a fair determination, and the decision was made in a responsible manner. Therefore, the Faculty Hearing Panel is in support of dismissing all charges associated with this case.

(*Id.* at 4.)

Plaintiff Enrique Seoane-Vazquez had voluntarily dismissed his first suit during this process, *Seoane-Vazquez v. The Ohio State University*, Case No. 07-775, later filing this new action. In his original complaint in this case, he alleged discrimination on the basis of national origin, retaliation for engaging in protected activity, and retaliation for association with other faculty members engaging in protected activity. Following the Court's January 25, 2011 Opinion and Order granting Defendant's motion to dismiss as to all of Plaintiff's claims except those based on the April 8, 2009 recommendation of Provost Alutto that Seoane be denied tenure and the October 26, 2009 actions of the University Faculty Hearing Committee dismissing Seoane's complaint regarding that decision, Plaintiff amended his complaint, alleging a cause of action solely for retaliation. This matter is now

16

before the Court on Defendant's motion for summary judgment.

        D.      **Summary Judgment**

      Summary judgment is appropriate "if the pleadings, the discovery and dis-closure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993).  To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993).  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

      In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (concluding that the court must draw all reasonable inferences in favor of the nonmoving party and must refrain from making credibility determ-

inations or weighing evidence). In responding to a motion for summary judgment, however, the nonmoving party "may not rest upon its mere allegations . . . but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Celotex*, 477 U.S. at 324. Furthermore, the existence of a mere scintilla of evidence in support of the nonmoving party's position will not be sufficient; there must be evidence on which the jury reasonably could find for the nonmoving party. *Anderson*, 477 U.S. at 251; *see Matsushita*, 475 U.S. at 587-88 (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment).

II. **Scope of EEOC Charge**

The amended complaint alleges that OSU denied Seoane tenure in retaliation for his filing complaints with OSU-HR and/or the EEOC and consulting an attorney. (February 4, 2011 Amended Complaint, ¶¶ 29-30, Doc. 30, PageID 1224.) Seoane's February 4, 2010 EEOC charge reads:

> I was hired as an Assistant Professor August 19, 2002 at The Ohio State University.
>
> After filing charges with EEOC, on October 26, 2009 the University Faculty Hiring Committee dismissed my appeal, and affirmed the denial of my tenure.
>
> I believe I was retaliated against for participating in a protected activity in violation of Title VII of The Civil Rights Act of 1964, as amended.

(February 4, 2011 Amended Complaint, Exh. 2, Doc. 30, PageID 1239.) Earlier, on October 30, 2009, Seoane executed an EEOC Intake Sheet that alleged OSU

retaliated against him for his having filed an earlier EEOC charge and having filed suit on that charge by denying him tenure. It also alleged that when Seoane requested an investigation into retaliation against Dr. Sheryl Szeinbach OSU falsely accused him of filing a frivolous complaint. Plaintiff asserted that his retaliatory treatment at the hands of his colleagues or OSU included the following incidents[8]:

1. Retaliatory statements by Balkrishnan at the ballot meeting.

2. Brueggemeier's decision to bar the distribution of the Meeting Letter at the ballot meeting.

3. Retaliatory selection of biased tenure reviewers.

4. Biased Chair Letter, Dean's Letter, and faculty ballot report.

5. Presentation by Brueggemeier and Buerki of incomplete and inaccurate information about Plaintiff's accomplishments at the ballot meeting.

6. The refusal by Brueggemeier, Nahata, and P&T to postpone

---

[8]These are referred to as Incident No. 1, Incident No. 2, and so on below. The incidents are not set out on the EEOC intake questionnaire form Seoane executed October 30, 2009. (Doc. 20-1, PageID 116-120.) Nor are they set out in Attachment A to that questionnaire, which is Seoane's answer to question 5 on the form that asks the employed to describe what happened that the employee believes was discriminatory. (Doc. 20-1, PageID 121-23.) Rather, these nine incidents can be found in Seoane's January 5, 2009 letter to Brueggemeier, his May 4, 2009 letter to Alutto, and his June 15, 2009 letter to CAFR Chair Marilyn Blackwell, which are incorporated by reference into Attachment A. Eric J. Rosenberg's October 25, 2010 Affidavit, ¶ 2 asserts that the mass of documents found in Docs. 20 through 26, which include these three letters, were submitted to the EEOC on November 2, 2009 with Seoane's October 30, 2009 intake questionnaire. (Doc. 20, PageID 110.) Specifically, Seoane's January 5, 2009 letter to Brueggemeier is found at Doc. 21-3, PageID 411-25; his May 4, 2009 letter to Alutto is at Doc. 24-1, PageID 811-25; and his June 15, 2009 letter to Blackwell is at Doc. 25-2, PageID 973-83.

the ballot meeting until OSU remedied Plaintiff's allega-
tions.

7. OSU Provost Joseph Alutto's April 8, 2009 recommendation
that Seoane be denied tenure.

8. FHC's October 26, 2009 decision to affirm Alutto's decision.

9. A July 2008 decision by OSU to subject Seoane to discipline
for having filed a complaint alleging retaliation against a
colleague.

(Amended Complaint, ¶¶ 12, 16, 21, 31, Doc. 30, PageID February 4, 2010 EEOC

Charge, Attachment A, Doc. 30, PageID 1234-36; Plaintiff's January 30, 2012

Memorandum Contra Defendant's Motion for Summary Judgment, p. 5, Doc. 94,

PageID 16297.) The Court's January 25, 2011 Opinion and Order held that Inci-

dents Nos. 7 (Provost Alutto's recommendation to the Board of Trustees that they

deny Seoane tenure) and 8 (FHC's rejection of Seoane's CAFR complaint) were

within the scope of Plaintiff's February 4, 2010 EEOC charge, but that Incidents

Nos. 1 through 6 were time barred because they involved events that occurred more

than 300 days before the filing of the intake questionnaire.[9] (Doc. 28 at 9-13,

---

[9]Specifically, the Opinion and Order held:
The parties disagree as to whether Plaintiff's November 2, 2009 intake
questionnaire or February 4, 2010 charge of discrimination qualifies as
his real 2009 charge. Nevertheless, 300 days before the earlier of these
two was January 6, 2009. Nos. 1, 2, 3, 4, 5, 6, and 9 of the above pre-
date this date, and therefore did not represent a timely basis for the
2009 EEOC charge. Plaintiff argues, as noted above, that equitable
tolling should act to save his earlier claims, but the Court has already
rejected this rationale. These allegations are therefore time-barred,
leaving at issue only Nos. 7 and 8, the April 8, 2009 Alutto recom-
mendation that tenure be denied, and the October 26, 2009 decision by
the faculty hearing committee to affirm Alutto's decision.

PageId 1212-16.)

On summary judgment, Defendant requests that the Court reconsider its decision that Incident No. 7 was within the scope of the EEOC charge, arguing again that Plaintiff only referred explicitly to No. 8, and that No 7 cannot reasonably be expected to grow out of the claims actually appearing in the charge. Defendant makes no new arguments. The Court continues to believe that an investigation of the charge, which alleges that Defendant retaliated against him when the FHC "dismissed my appeal, and affirmed the denial of my tenure," would include the Provost's denial of tenure. The Intake Sheet makes clear that Seoane believed he was retaliated against by his supervisors and coworkers and that the retaliation worked its way up and infected each subsequent decision made regarding OSU denying him tenure. For that reason and for the reasons articulated in the January 25, 2011 Opinion and Order, Defendant's request for reconsideration is denied.

Plaintiff, for his part, requests that the Court reconsider its finding that Incidents Nos. 1-6 and 9 were *not* within the scope of the EEOC charge. He argues again that the Court should have applied the doctrine of equitable tolling to find that the other allegations were independent actionable claims, because OSU's machinations had given rise to circumstances beyond his control preventing him

(January 25, 2011 Opinion and Order, pp. 9-10, Doc. 28, PageID 1212-13.) Three hundred days before November 9, 2009 was December 13, 2008. By then the Chair letter (October 28, 2008) had been written and the tenure meeting and vote had taken place December 1, 2008). Brueggemeier's December 17, 2008 letter to Alutto recommending denial of tenure was written within the 300 day period. Alutto's final decision denying tenure was well within the 300 day period.

21

from timely filing an EEOC charge.  The Court has already addressed Plaintiff's argument on this score (Doc. 28 at 4-9) at some length, and Plaintiff has advanced no new facts or argument that would lead it to reconsider the question.

Accordingly, the Court will address only Incidents Nos. 7 and 8, the only two covered within the scope of Seoane's EEOC charge. Consideration of these claims will necessarily address Plaintiff's assertion that Incidents Nos. 1 through 6 are evidence supporting his cat's paw liability theory that the adverse employment actions alleged in Allegations Nos. 7 and 8[10] were caused by the retaliatory actions of his supervisors and coworkers.

### III. Actionability of FHC Review

In the Court's January 25, 2011 Opinion and Order granting Defendant's motion to dismiss in part, it addressed Defendant's argument that Plaintiff's claim could not be based upon the October 26, 2009 decision of the Faculty Hearing Committee to dismiss Seoane's complaint:

> Defendant argues with respect to No. 8 that denial of Plaintiff's appeal of his denial of tenure is, as a matter of law, not an adverse employ-ment action giving rise to a *prima facie* claim of retaliation under Title VII.  *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 345 (6th Cir. 2008), citing *Morris v. Oldham County. Fiscal Court.*, 201 F.3d 784, 792 (6th Cir. 2000).  It cites *Delaware State College v. Ricks*, 449 U.S. 250 (1980) for the proposition that only the initial denial of tenure could have been actionable, not an unfavorable outcome of a later grievance process.  Plaintiff rejoins that, under *Reid v. Univ. of*

---

[10]  Plaintiff makes little reference to Incident No. 9 in his brief, and makes no argument that it, or attempts to excuse it, were proximately responsible for the ad-verse employment action taken against him.  Accordingly, the Court will not ad-dress it further.

*Michigan*, 612 F.Supp. 320 (W.D. Mich. 1985), a review of tenure decision which was sufficiently *de novo* could itself be an actionable final decision. The parties disagree as to what extent the review of Plaintiff's tenure appeal under OSU rules should be considered a *de novo* "do-over". Analysis of OSU's tenure appeal rules is a matter outside the scope of the pleadings in this action, and the Court declines at this time to treat Defendant's motion as one for summary judgment under Fed. R. Civ. P. 56. Whether or not the denial of Plaintiff's appeal qualified as an adverse employment action is a question therefore not presently at issue.

(Doc. 28 at 13-14.) Upon summary judgment, this question is now at issue.[11]

Ohio Adm. Code § § 3335-5-05(C) provides that a member of faculty can submit a complaint alleging improper evaluation to a faculty hearing committee for a hearing. Then:

(6) At the conclusion of a hearing, the hearing panel shall:

(a) Dismiss the complaint if it determines that there has been no improper evaluation.

(b) When it has found that an improper evaluation has been made, submit its findings to the dean of the college in which the complainant is a member and to the executive vice president and provost. The executive vice president and provost, in consultation with the hearing panel and the chair of the faculty hearing committee, shall take such steps as may be deemed necessary to assure a new, fair, and impartial evaluation. A copy of the hearing panel's findings shall also be sent to the president.

(7) If a decision is remanded under paragraph (C)(6)(b) of this rule, it shall be reconsidered promptly. Within thirty days of the receipt of the hearing panel's decision, the executive vice president and provost shall respond in writing to the hearing panel and the president, stating

_____

[11] Plaintiff's contention (Doc. 94-1 at 145) that the Court has "previously rejected this argument" lacks merit. In the passage quoted above, which Plaintiff himself cites, the Court stated explicitly that the question was "not presently at issue," not that it had found in Plaintiff's favor.

what action has been taken and the reasons therefor.

One question is whether this rule bestows upon the FHC Hearing Panel, as Plaintiff argues, the right to order a *de novo* tenure review that can completely reverse earlier negative tenure recommendations. (Memo Contra, pp. 62-63, Doc. 94-1, PageID 16437-38.) Plaintiff cites to the depositions of Dr. Threlfall, a member of the FHC, who stated his understanding that, based on the findings of the hearing panel, "there can be a *de novo* redo of the tenure" (Threlfall Dep., pp. 38-39, Doc. 39-1, PageID 2208), Alutto, who acknowledged that "if the UHC[12] determines there's a problem, they can recommend the *de novo* do over" (Alutto Dep., p. 128, Doc. 38-1, PageID 1306), and Dr. Beck, another member of FHC, who acknowledged that he understood the rules to provide that "you could have caused a *de novo* review to start the process over again if you would have found a problem" (Beck Dep., p. 107, Doc. 82, PageID 12429). Section 3335-5-05(C), of course, speaks for itself regardless of the opinions of Threlfall, Alutto, and Beck as to its scope. More concretely, Plaintiff argues that, under Section 6(b), the provost "shall take such steps as may be deemed necessary to assure a new, fair, and impartial evaluation" upon receiving a hearing panel finding of an improper evaluation. This, he states, indicates that the hearing panel has the authority to order a new, *de novo* tenure review, because such review would follow automatically and without discretion from their finding of impropriety.

---

[12]Plaintiff refers to the FHC throughout at the UHC; consequently, the questioning during Alutto's deposition used UHC for FHC.

Defendant rejoins that "a hearing panel cannot order anyone to do anything," and that under this rule the provost is vested with discretion to take "such steps he deems necessary for additional evaluation or a *de novo* tenure review." (Doc. 102 at 40.) It observes that Section 7 provides that "[i]f a decision is remanded under paragraph (C)(6)(b) of this rule, it shall be reconsidered promptly," arguing that this language implies that a remand might or might not occur, and that the provost is likewise required to report "what action has been taken," implying that other outcomes than a *de novo* tenure review are possible.

Analysis. Contrary to Defendant's argument, Section 6(b) does, on its face, mandate that the provost take whatever steps are necessary "to assure a new, fair, and impartial evaluation." He cannot, under the literal text of this regulation, refuse to act to bring about a new evaluation. However, contrary to Plaintiff's argument, Section 6 does not mandate that the new evaluation be a complete *de novo* tenure review. Section 7 describes this new evaluation as a "remand" for prompt "reconsideration". The use of the term "reconsideration" implies that the body or individual appealed from is to render a new judgment in light of additional evidence or argument – here, the findings of the hearing panel. The regulation therefore could simply require the provost to issue a new decision, taking into account the findings of the hearing panel. It does not mandate that the tenure process begin again *ab initio* with a new dossier and another faculty ballot.

The question then is whether the unlawful employment practice that is subject to suit under Title VII is the FHC's disposition of Seoane's complaint or the

initial decision by the Provost to deny tenure. In *Delaware State College v. Ricks*, 449 U.S. 250 (1980), a professor was denied tenure by the board of trustees of his institution based upon the recommendations of the tenure committee and faculty senate. Seoane filed a grievance of the decision, which was denied. In ensuing litigation concerning alleged national origin discrimination, the question arose as to whether the initial decision to deny tenure or subsequent denial of his grievance constituted the unlawful employment practice. The *Ricks* Court found that it was the former:

> [E]ntertaining a grievance complaining of the tenure decision does not suggest that the earlier decision was in any respect tentative. The grievance procedure, by its nature, is a remedy for a prior decision, not an opportunity to influence that decision before it is made.
> . . . [W]e have already held that the pendency of a grievance, or some other method of collateral review of an employment decision, does not toll the running of the limitations periods. *Electrical Workers v. Robbins & Myers, Inc.*, 429 U.S. 229, 97 S.Ct. 441, 50 L.Ed.2d 427 (1976). The existence of careful procedures to assure fairness in the tenure decision should not obscure the principle that limitations periods normally commence when the employer's decision is made.

*Id.* at 261. *See also Chardon v. Fernandez*, 454 U.S. 6 (1981).

Likewise, in *Lever v. Northwestern Univ.*, 979 F.2d 552 (7th Cir. 1992), the Seventh Circuit Court of Appeals addressed a situation where a professor was denied tenure by the faculty tenure committee, allegedly on the basis of sex, and the university dean advised her that he would not recommend that she be granted tenure. After the professor, and her department, protested, the dean agreed to consider the professor's forthcoming book once it was published, and then make a decision to reverse or confirm his decision. After the book was published, the dean

26

concluded that the professor nevertheless should not be granted tenure. The district court, applying *Ricks* and *Chardon*, concluded that the Dean's initial decision had been definitive, with later proceedings merely amounting to appeals and requests for review. On appeal, the Seventh Circuit agreed, finding that "[a]n employer's refusal to undo a discriminatory decision is not a fresh act of discrimination. If it were, then an employee could avoid the 300-day limit by filing a series of appeals or fresh requests; *Ricks* and *Chardon* hold that adverse decisions on appeals do not re-start the time for filing a charge." *Id.* at 556.

Plaintiff here urges the Court to instead follow the reasoning of the United States District Court for the Eastern District of Michigan in *Reid v. University of Michigan*, 612 F.Supp. 320 (E.D. Mich. 1985). There a professor who had been denied tenure by her department, allegedly on the basis of race and sex, filed a grievance of the decision. The grievance committee found that it was valid, and recommended reconsideration, with specific advice that due to the unusual nature of the case novel and extraordinary procedures be adopted to modify the tenure decision process. The university then adopted these new procedures, but upon reconsideration nevertheless again decided not to grant tenure. After she filed suit, the university argued, invoking *Ricks*, that the alleged unlawful employment practice was the initial tenure decision, with all that followed constituting merely subsequent and resulting grievance procedures rather than a new adverse action.

The *Reid* court found that the facts differed from *Ricks* in that "[i]n this case, defendant decided that its original decision-making process was flawed and then

27

made a *de novo* tenure decision within the actionable period." *Id.* at 324.  Where the university had actually agreed to re-do the professor's tenure review following a new process, the court determined, the subsequent second denial actually constituted a new unlawful employment practice.  *Id.*

Plaintiff here has made no showing that the facts in this case resemble *Reid* more than *Ricks*.  He followed the rules cited above, appealing the provost's decision to deny tenure to the faculty hearing committee.  The FHC dismissed his complaint.  Unlike *Ricks*, there was, in fact, no *de novo* review. Whether or not the hearing panel could have ordered a *de novo* review, its decision was not *in and of itself* a *de novo* review.  The hearing panel did not, for example, solicit new letters from external reviewers, order the compilation of a new dossier, debate Seoane's research, and *then* dismiss his complaint.  The role of the hearing panel in this matter fits precisely into the grievances or appeals contemplated by *Ricks*, as a review that merely failed to remedy a prior decision.  It was a "refusal to undo a discriminatory decision" that, as in *Lever*, did not constitute a fresh act of discrimination.

Accordingly, the Court finds that the October 26, 2009 decision of the Faculty Hearing Committee to dismiss Plaintiff's complaint was not, as a matter of law, an actionable adverse employment action, and cannot form the basis of Plaintiff's claims here.  The April 8, 2009 decision of Provost Alutto to deny Seoane tenure is therefore the only actionable incident of alleged retaliation now before the Court. The Court can now turn to the question of whether Plaintiff has made out a *prima*

*facie* case that Alutto's decision was retaliatory.

IV. **Title VII Retaliation**

Under Section 704(a) of Title VII of the Civil Rights Act of 1964, it is an

unlawful employment practice for an employer to discriminate against any of his

employees "because he has made a charge, testified, assisted, or participated in any

manner in an investigation, proceeding, or hearing under this subchapter." 42

U.S.C. §2000e-3(a). To succeed on a claim that he was retaliated against for

making a claim of discrimination, the plaintiff must first make out a *prima facie*

case of retaliation, proving by a preponderance of the evidence that (1) he engaged

in protected activity; (2) that his employer knew he engaged in protected activity;

(3) that his employer took materially adverse action against him; and (4) that the

employer took such action because he engaged in protected activity. *Burlington N.*

*& Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68-69 (2006); *Hawkins v. Anheuser-*

*Busch, Inc.*, 517 F.3d 321, 345 (6th Cir. 2008). The burden of establishing a prima

facie case in a retaliation action is not onerous, but rather one easily met. *Nguyen*

*v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

Should the plaintiff succeed in establishing his *prima facie* case, the burden

then shifts to the employer to demonstrate that it had a legitimate, non-discrim-

inatory reason for taking the adverse employment action. If the employer should do

so, the burden then shifts back to the plaintiff to demonstrate that those reasons

were only a pretext for discrimination. *Johnson v. Univ. of Cincinnati*, 215 F.3d

561, 573 (6th Cir. 2000). To accomplish this, the plaintiff must demonstrate by a

preponderance of the evidence that the proffered reason: (1) has no basis in fact; (2) did not actually motivate the adverse action; or (3) was insufficient to motivate the adverse action. *Abbot v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 2003).

The parties here do not dispute that Plaintiff engaged in the protected activity of filing discrimination complaints, or that Defendant knew of this protected activity. The parties also do not dispute that Provost Alutto's final decision denying Seoane tenure was an adverse employment action. The first three elements are thus satisfied. As to the last, however, Plaintiff does not argue that Provost Alutto was himself motivated by retaliatory animus. Instead, he advances a "cat's paw" theory that Alutto was induced by others with discriminatory motives into taking adverse employment action. Defendant, for its part, argues that the cat's paw theory cannot be applied to this situation and is not supported by the evidence.

## V. Cat's Paw Liability

### A.    Nature of Cat's Paw Liability

The "cat's paw" theory of liability "refers to a situation in which 'a biased subordinate, who lacks decision-making power, influences the unbiased decision-maker to make an adverse [employment] decision, thereby hiding the subordinate's discriminatory intent." *Bobo v. United Parcel Service*, 665 F.3d 741, 755 (6th Cir. 2012), quoting *Cobbins v. Tennessee Dep't of Transp.*, 566 F.3d 582, 586 n. 5 (6th Cir. 2009). This doctrine is illustrated by the recent United States Supreme Court case of *Staub v. Proctor Hospital*, 131 S.Ct. 1186 (2011). In *Staub*, a member of the

30

U.S. Army Reserve was employed as a technician at a hospital, but his two immediate supervisors were hostile to his military service. One supervisor issued Staub a disciplinary warning based upon an allegedly fabricated allegation; then the other presented a report to the vice president of human resources that Staub had violated rules despite the warning. The vice president reviewed Staub's personnel file and decided to terminate him. Staub brought suit against the hospital under USERRA, a statute barring discrimination against servicemembers (and similar in all material respects to Title VII), arguing that although the vice president was not hostile to his military service, his supervisors were and had taken hostile actions intended to influence his decision.

The *Staub* Court held that "if a supervisor performs an act motivated by antimilitary animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA." *Id.* at 1194 (emphasis in original). This doctrine will therefore create a substitute for the fourth element of a *prima facie* case of retaliation – that the employer be shown to have taken adverse employment action because the employee engaged in protected activity – satisfied by a showing instead that (1) nondecisionmaking supervisors performed acts motivated by retaliatory animus that (2) were intended to cause an adverse employment action and (3) were a proximate cause of the decisionmaker's ultimate employment action.

It is not clear whether cat's paw liability applies to hostile acts by mere co-

31

workers, as opposed to supervisors. The *Staub* Court explicitly "express[ed] no view" on the question. *Id.* at fn 4. One district court in this circuit recently reviewed the extant case law and found that, though *Staub* had left the question open, neither the Sixth Circuit nor other district courts within it had extended cat's paw liability to the actions of coworkers rather than supervisors. *Reynolds v. Federal Express Corp.*, 2012 WL 1107834 at *19 (W.D. Tenn Mar. 31, 2012). However, given the unusual circumstances of a claim surrounding a tenure decision, where among other things the plaintiff's coworkers participated in a process where they met and voted whether to recommend his promotion, the line between coworker and supervisor is significantly blurred. The Court will therefore assume, without holding, that in his allegations in this action Seoane's colleagues satisfied the roles of supervisors for purposes of a cat's paw analysis.

B.    **Proximate Cause in Cat's Paw Liability**

As set forth above, Seoane was afforded, and took, an opportunity in his comments letter to defend his record and to put forward his arguments for why the statements and conclusions of others were biased or tainted. Provost Alutto, the ultimate decisionmaker, either disagreed with these allegations or found them irrelevant to the substantive matter of whether Seoane's record demonstrated that he should be awarded tenure. Two questions arise: has Plaintiff offered evidence of retaliatory acts intended by his supervisors and coworkers to cause him to suffer an adverse employment action, and, if so, whether there is evidence from which the finder of fact could find by a preponderance that these acts were a proximate cause

32

of Alutto's decision to deny Seoane tenure.

### 1. Retaliatory Acts and Proximate Causation

In opposition to summary judgment, Plaintiff argues that the intentional, retaliatory acts of Seoane's supervisors and coworkers cause Alutto to deny him tenure. He argues that he has satisfied the fourth element of his *prima facie* case by offering evidence that supervisors and coworkers acted with discriminatory animus, that their acts were intended to cause an adverse employment action, and their acts were a proximate cause of Alutto's decision to deny tenure. (Plaintiff's January 30, 2012 Memo Contra, pp. 23-24, Doc. 94, PageID 16315-16.)

Plaintiff does not identify his original list of "Retaliation Incidents" as having been the acts motivated by discriminatory animus underlying his claim of cat's paw liability. Instead, his argument is one step removed: Plaintiff is now arguing not that his supervisors' and coworkers' retaliatory actions themselves influenced Alutto to deny him tenure, but that their actions in providing information about these incidents resulted in Alutto's failure to believe and act on Seoane's allegations of biased treatment. For instance, where Plaintiff originally cited Balkrishnan's statements at the ballot meeting as having themselves been a retaliatory action, he bases his claim now instead on Brueggemeier's explanation, when questioned by Anderson, that the incident had been brief and minor:

> So why did Alutto and the UHC refuse to give credence to Seoane's
> account of Retaliation Incident 1? The principal reason was Brueg-
> gemeier's false statements attempting to minimize Retaliation In-
> cident 1. Brueggemeier claimed that when Balkrishnan raised
> Seoane's "Title VII claims at the COP Tenure Vote, he 'was cut off by

33

the chair immediately and told he was out of order.'" Brueggemeier's claim directly contradicts the audiotape (and) Brueggemeier's own deposition testimony.

(*Id.*, p. 28, Doc. 94 PageID 16320.)  Plaintiff concludes from this:

> Moreover, Seoane establishes *prima facie* cat's paw liability under a *Staub* analysis by showing Brueggemeier's false testimony regarding Retaliation Incident 1 was: (a) intended to cause Alutto and the UHC to reject Retaliation Incident 1; (b) intended to affirm the negative Seoane COP Tenure Vote; and (c) situated to be a proximate cause of Alutto and the UHC's *decision to reject Seoane's evidence* in support of Retaliation Incident 1.

(*Id.,* 33-34Doc. 94, PageID 16325-26, emphasis added.)

Plaintiff's premise is that Alutto's rejection of Seoane's claim that the tenure process was biased or tainted demonstrates that Alutto's ultimate decision to deny tenure was retaliatory.  In other words, Plaintiff asserts that, if he had not been deceived by Seoane's supervisors and coworkers, Alutto would have agreed with his allegations of a hopelessly tainted process and granted tenure or at least a new tenure review.

The issue presented for decision is whether Plaintiff has presented evidence from which a reasonable trier of fact could conclude by a preponderance that Seoane's supervisors and coworkers made, with retaliatory animus, false state-ments that were a proximate cause of Alutto's decision to deny tenure. This requires consideration of the evidence Plaintiff offers to support his argument that Buerki, Nahata, and Brueggemeier engaged in conduct motivated by a retaliatory animus to cause Alutto to deny Seoane tenure. Plaintiff maintains that they caused Alutto to accept their explanations of and discount the retaliatory conduct described in

34

Incidents Nos. 1 through 6.

**Incident 1**: There is no genuine question as to whether Balkrishnan made statements at the ballot meeting that Seoane had made "accusations" later "found to be without merit,"[13] and his statements were, plainly, explicit invitations for his colleagues to consider negatively his protected conduct.

Plaintiff argues Balkrishnan's untruthful statements were intended to influence the COP P&T Committee to vote to deny him tenure. He further argues that Alutto and the FHC Hearing Panel later believed Brueggemeier's statement that Balkrishnan had been immediately ruled out of order. Seoane provided both Alutto and the FHC Hearing Panel with copies of the OSU-HR investigation report. Consequently, Alutto and the FHC Hearing Panel could draw their own conclusions about whether the OSU-HR investigation vindicated Balkrishnan.

Plaintiff has offered evidence that, if credited by the finder of fact, would establish that Balkrishnan, animated by discriminatory animus, intended to cause the P&T Committee to deny Seoane tenure. Plaintiff argues that Balkrishnan, Brueggemeier, and Nahata did not disclose their discriminatory conduct to Alutto, which, of course, they would not if their intent was to cause Alutto to deny Seoane tenure. Plaintiff also asserts that Alutto relied on Brueggemeier's statement that Balkrishnan's comment that investigations determined Seoane's retaliation

---

[13]Balkrishnan (Defendant's December 16, 2011, Motion Summary judgment, Doc. 76, Ex. N, Transcript from Audio Recording, Doc. 76-19, p. 84, PageID 10692) and Nahata's (*Id.,* pp. 109-10, PageID 10717-18.) statements are set out above in the text at footnote 6.

complaints lacked merit were brief and immediately stopped by the Chair.

Plaintiff further argues that Dr. Nahata repeatedly referred to the facts underlying Seoane's 2006 retaliation complaint that he "surreptitiously appropriated for himself a $50,000 grant" from the Ohio Department of Mental Health. This is the "research theft" allegation by Seoane that Balkrishnan said had been investigated and found meritless. Nahata said that Seoane's accusation was "fully false." Nahata maintained that the grantor called him and said they did not want to work with Seoane. Nahata then went to Brueggemeier and asked what they should do. Brueggemeier told him it was alright for him to apply for the grant since they had already rejected Seoane's grant application. (*Id.,* p. 110, Doc. 76-19, PageID 10718.) While offering no admissible evidence supporting the position, Plaintiff asserts that the Ohio Department of Mental Health did not tell Nahata they did not want to work with Seoane.[14]

---

[14]In support of this argument Plaintiff offers his expert's unsworn report. Dr. Schondelmeyer asserts that he reviewed the deposition of Leonard Mills, chief of the Ohio Department of Mental Health's Office of Support Services, and found no evidence supporting Nahata's statement that the Ohio Department of Health told him that it "did not want to work with Dr. Seoane-Vazquez." (August 1, 2011 Expert Report of Stephen W. Schondelmeyer, Doc. 75-3, ¶ 84, PageID 9905.) Plaintiff has not filed the deposition of Leonard Mills.

Defendant attached to its reply brief excerpts from Mills' deposition. The excerpts demonstrate that the Department never received a grant proposal from Seoane and made a decision not to pursue a grant with him because people in his Department were "not happy with [a previous] study" Seoane had done for them that was composed of "a lot of material they felt you could get directly from the Internet." Mills Dep., p. 17, Doc. 102-10, PageID 17407.) Although Mills said he had not told Nahata that the Department did not want to work with Seoane, he could not rule out that other people in the Department might have been in direct contact with Nahata. (*Id.,* pp. 18 and 23-24, PageID 17408-10.)

36

Plaintiff argues that Brueggemeier made a false statement to Carole Anderson that caused Alutto to refuse to give credence to Seoane's account of Incident 1. On April 7, 2009, Anderson wrote to Alutto that she had met with Brueggemeier and the University's legal counsel to review the points made by Seoane in response to the decisions by the P&T Committee and Brueggemeier to recommend denial of tenure. As to Incident 1, Anderson wrote:

> Professor Balkrishnan apparently did bring up at the meeting of faculty Dr. Seoane-Vazquez Title VII claims but he was cut off by the chair immediate and told he was out of order. I do not see how that brief comment could have affected the outcome of the vote. Indeed, Dr. Balkrishnan was merely one vote and any 'negative' participation by him was cancelled out by the 'positive' participation of Dr. Cheryl Szeinbach, who participated fully in the promotion and tenure review, notwithstanding certain conflict of interest concerns (she is co-authored on several publications with Dr. Seoane-Vazquez).

(Doc. 38-15, PageID 2023.) That account is inaccurate to the extent that it asserts Balkrishnan was immediately cut off by the chair. However, Balkrishnan's statement about Seoane's complaint that Nahata took a grant from him did come at the very end of his comments.

Immediately after Balkrishnan's comment set out above, Dr. Carnes changed the topic to Seoane's teaching. (Doc. 76, Ex. N, Transcript from Audio Recording, pp. 84-85, Doc. 76-19, p. 60, PageID 10692-93.) Then a dispute about Seoane's teaching broke out, and Dr. Wientjes said that he had observed Seoane teach and was impressed by his abilities as a teacher. He observed that "there's a lot of fighting inside your college and a lot of aggressiveness going around, back and forth." Wientjes proposed evaluating Seoane "on what he has done and how well he has

37

done, and not on how many people in this division apparently dislike him for reasons that may or may not be very good." (*Id.,* pp86-87, PageID 10694-95.)

Next Dr. Au, who had participated in the University's investigation of Seoane's complaint, then said that she disagreed about Balkrishnan's comment that the investigations determined Seoane's complaints were without merit. She said that the investigating committee found "something wrong" and that the complaints "cannot be just simply dismissed." (*Id.,* pp87-88, PageID 10695-96.) The discussion then turned to Seoane's peer-reviewed funding. (*Id.,* pp89-97, PageID 1069297-05.) It is clear that at least some of the faculty present had carefully read, at the very least, the grant funding portions of the external reviewer letters. (*Id.,* pp96-97, PageID 10704-05.)

After the discussion of grant funding, there was a discussion about the quality of Seoane's publications. (*Id.,* pp97-107, PageID 10705-15.) Dr. Au then made a plea, "Let us not fight anymore, lets get this done, Cheryl, Okay? Please?" (*Id.,* p. 107, PageID 10715.) She was followed by Nahata, who made his statement about how he had attempted to deal fairly with Seoane and his denial of Seoane's charge that he had surreptitiously taken an Ohio Department of Mental Health grant away from him; and Cheryl Szeinbach questioned Nahata about his conduct concerning the grant. (*Id.,* pp109-11, PageID 10717-19.) It was then suggested that they vote and, after several general comments about Seoane's overall qualifications, the vote was taken. (*Id.,* pp112-18, PageID 10720-26.)

In addition to Anderson's letter, Alutto had Seoane's position regarding the

investigation concerning his complaint about the Ohio Department of Health grant and copies of the OSU-HR investigator's report. (Seoane's January 5, 2009 Letter to Brueggemeier, p. 9, Doc. 38-14, PageID 1862-1875; Plaintiff's Ex. 32, Seoane's Petition to OSU's Senate Committee on Academic Freedom, Docs. 52-29 and 52-30, PageID 4477-4634.)

Although not within the scope of the charge relying on Incident 1, Plaintiff further argues that Brueggemeier failed to follow the recommendations of OSU-HR investigator Carmeen Yarbrough regarding Balkrishnan's annual review. (Doc. 52-29, PageID 4498, 4511.) This argument will be addressed below.

Plaintiff argues that Balkrishnan and Nahata's retaliatory and false comments amount to direct evidence of cat's paw retaliation, comparing those comments to the ageist comments made by a faculty member during a meeting to decide whether to grant tenure in *Mandavalli v. Maldonado,* 38 F.Supp.2d 180, 191-93 (D.C. P.R. 1999). Similarly, Plaintiff argues that Brueggemeier's statement are direct evidence of retaliation comparable to a supervisor's discriminatory comments in *Washburn v. General Electric Capital Corp.,* 2011 U.S. Dist. Lexis 78858 (E.D. Mich. July 20, 2011).

Defendant counters that eight of the sixteen faculty who cast ballots aside from Balkrishnan were actually deposed and asked whether they considered Balkrishnan's remarks.[15] As Defendant has demonstrated, they testified that they

---

[15] COP rules require a 67% positive vote for the college faculty to be considered to have recommended in favor of tenure. (Doc. 77-1 at 41.) The faculty's vote was seven positive, ten negative, and four abstentions. (Doc. 77-1 at 29.)

either had not listened or had voted to grant tenure anyway. *See* citations at Doc. 76 at 46-47 for Young ("kind of zone out when that guy talks"); Kinghorn ("couldn't understand a word [Balkrishnan] said"); Carnes (did not remember Balkrishnan saying anything); McAuley (vaguely recalled Balkrishnan saying something about an investigation); Buerki (could not remember whether Balkrishnan said anything about an investigation; it "sounds like something he might have said"); Wientjes (recalled Balkrishnan's comments, voted yes); Au (recalled Balkrishnan's comments, voted yes); Szeinbach (thought Balkrishnan might have said something about the EEOC, voted yes).

**Incident 2**: This incident is Brueggemeier's decision to bar distribution of Seoane's comment letter[16] at the ballot meeting. Plaintiff alleges that, when asked by Anderson about Seoane's complaints that Buerki had not been permitted to distribute the comments letter, Brueggemeier told her that there had been an overwhelming consensus of faculty present not to permit distribution. Plaintiff argues that Brueggemeier's statement to the FHC that Buerki incorporated all relevant information from Seoane's letter into his presentation was false. Plaintiff argues that false statement creates cat's paw liability because it was intended to cause

---

Defendant has presented deposition testimony, which Plaintiff has not refuted, that Young, Kinghorn, Carnes, McAuley, and Buerki voted no on grounds other than Balkrishnan's encouragement to retaliate. Balkrishnan likewise voted no. (Doc. 62 at 46.) Even if it could be somehow proven that, but for Balkrishnan's comments, the other four negative votes would have been positive, the resulting 11-6-4 vote still would not have presented Plaintiff with a sufficient majority.

[16]Seoane's January 9, 2009 comment letter did become part of his dossier. (Alutto Dep. Ex. 11, Doc. 38-14, PageID 1861-75.)

Alutto to reject retaliation Incident 2.

The Court has noted above the exchange which ended discussion of the comment letter question, which is not materially at odds with Brueggemeier's statement that University rules prohibited distribution of the candidate's letter until after the ballot meeting, and the OSU Rules provide explicitly that the candidate may submit a comments letter after the ballot meeting, not before:

> The candidate may provide the tenure initiating unit chair with written comments on the tenure initiating unit review for inclusion in the dossier within ten calendar days of *notification of the completion* of the review. The promotion and tenure committee and/or chair may provide written responses to the candidate's comments for inclusion in the dossier. *Only one iteration* of comments on the departmental level is permitted.

O.R.C. §3335-06-04(B)(5) (emphasis added).

There is also no reason at all to suppose that Alutto would have questioned the decision to follow the university rules regardless of how Brueggemeier had characterized the incident, given his deposition testimony:

> Q. All right. Given Buerki's comments, do you think the letter should have been distributed?
> A. No.
> Q. Why not?
> A. Because it really did violate the process, and he had an opportunity to respond afterwards as is required in the procedures.

(Alutto Dep., p. 62, Doc. 38-1, PageID 1290.)

Plaintiff argues at length about information in his pre-tenure meeting letter that was not included in Buerki's chair letter.[17] The information that Plaintiff

---

[17]Plaintiff's briefs sets out these factual assertions in Seoane's letter that were not included in Buerki's:

maintains should have been in the Chair letter is not relevant to Incident 2. The

Chair letter is part of Incident 4, discussed below.

---

1. How Seoane asked COP "not to include . . . Kreling as one of [Seoane's] external reviewer . . . [because] a Division faculty member . . . acknowledged that he made inappropriate comments to . . . Kreling and other external reviewers during [Seoane's] four-year review."

2. "In the area of service . . . [Seoane's] offers to participate in the Division Admission Committee and task force for evaluating the Master in Health Systems Pharmacy Administration were dismissed and [Seoane] was excluded from the faculty searching committee."

3. "In the area of teaching: 1) some of [Seoane's] students were asked to work with other faculty or leave the University; 2) many students were subjected to intimidation by other faculty members because these students were working with [Seoane]; 3) as new students expressed their interest in working with [Seoane] some were discouraged from doing so or were prohibited from working with [Seoane] or taking [Seoane's] course – even required courses; 4) and, as students continue selecting [Seoane] as their advisor, admissions to [Seoane's] Pd.D. program were suspended."

4. Seoane's [effort to secure grant] funding was impeded. For example, one of the grant proposals [Seoane] submitted to a state agency was replaced, without [his] knowledge, by another proposal from" Nahata and Balkrishnan.

5. Addressing how Buerki's letter excluded some of the most positive comments made by Seoane's external reviewers.

6. With regard to comments in Buerki's letter about concerns raised by faculty in Seoane's Division regarding the quantity of Seoane's scholarly publications, Seoane wrote: "during [Seoane's] years at OSU [Seoane published] more peer reviewed articles than the cumulative 18 publications requested in [Seoane's] Division annual reviews."

7. With regard to comments Buerki's letter about Seoane's "not responding to a request to teach a graduate course, Seoane wrote: "[t]his is not correct as [Seoane] had expressed on several emails to the Division that [Seoane] would be happy to collaborate in these new courses even if they increased [Seoane's] already high teaching responsibilities."

8. With regard to comments Buerki's letter about concerns regarding Seoane's service to the Division, Seoane detailed may examples of how his "offers to participate in Division activities were dismissed."

(Memo Contra, p. 44, Doc. 94, PageID 16336; Memo Contra, Ex. A, ¶ 22, Doc. 95-1, PageID 16452-53.)

**Incident 3**: Plaintiff maintains that the persons responsible for initiating and conducting the tenure review, motivated by a retaliatory bias, selected external reviewers who were hostile to him and refused to exclude those reviews from consideration by the ballot committee. He raised concerns about letters prepared by external reviewers Kreling and Dr. Caroline Gaither. He maintains that these external reviewers were prohibited by the rule that excluded external reviewers "who cannot provide an arm's length evaluation."

Plaintiff further argues that he was disadvantaged by the COP practice of selecting external reviewers before providing the tenure candidate with their names. Beyond that, Plaintiff asserts that Buerki and Brueggemeier told the FHC that the external reviewers were contacted after COP provided their names to Seoane. The only evidence offered to support this assertion is the deposition testimony of Walter R. Threlfall that his impression was that Brueggemeier told him that Seoane had the opportunity to see the list of external reviewers before letters went out to them. (Threlfall Dep., pp. 45-47 and 54-56, 39-1, PageID 2210 and 2212.) Dr. Threlfall testified:

> Q. All right. Below that Beck writes that Pharmacy's procedures was not to show an early list to the candidate. What do you recall the dean saying about that issue?
> A. Other than that was their procedure, nothing, a statement of fact.
> Q. Now, do you believe that's referring to external review letters?
> A. That would be what it should be referring to, yes.
> Q. All right. And I'm–I don't want to trick you because part of your report later says that Enrique did not see the names of the external reviewers before they were requested because that's the practice of the College of Pharmacy. Do you remember something like that?

43

> A. The Pharmacy's procedure, yes.
>
> Q. All right. But that - b u t you explained to me earlier that when you talked to Buerki you got the impression that he had seen a list before and had an opportunity to object but didn't?
>
> A. That was my impression.

(*Id.,* pp. 54:10 - 55:8, Doc. 39-1, PageID 2212). Threlfall and CAFR knew that the COP's procedure was not to show an early list of external reviewers to the candidate. Further, Buerki's June 12, 2009 letter to CAFR (which also went to the Hearing Panel) states that the external reviewers were contacted on August 18, 2008 and August 20, 2008, but that Dr. Seoane was not provided the list of reviewers until September 25, 2008. (June 12, 2009 Buerki Letter to Patrick Robin, p. 2, ## 9 and 10, February 24, 2012 Reply Brief, Ex. T, Doc. 102-17, PageID 17513.) Finally, the Hearing Panel Report states that COP followed its usual procedure of "divulging the names of external reviewers to candidates only after letters have been solicited." (CAFR Hearing Panel Decision, p. 5. Doc. 76-18, PageID 10592.)

Plaintiff also questions why Buerki solicited Gaither, whose review many saw as largely negative, to serve as an external reviewer. Although Buerki maintained that he wanted to be sure there were six reviewers as required by COP rules, Plaintiff points out that there were only five external reviewers for Dr. Esperanza Carache-de Blanco. Moreover, there were already six external review letters in Seoane's dossier before Gaither's letter was received. (Buerki Dep., Ex. 351 and Tr. 157-59, l. 11-4, Doc. 64, PageID 7157-59 and 7057.)

<u>Incident 4</u>: Plaintiff maintains that Provost Alutto's decision to deny tenure

was directly or indirectly influenced by

- Dean Brueggemeier's March 16, 2007 four-year review letter's criticism that Seoane was the "principal investigator on two small projects funded [by] State of Ohio agencies and on four small projects from international organizations" that may not have been peer-reviewed and the expectation that he would "secure research funding from federal agencies (such as HHS, AHRQ, NIH or NSF) that involve standard peer-review processes . . . ." Doc. 38-8, PageID 1574-75.

- Inaccurate representation of Seoane's research, grant funding, and publication record in Buerki's October 10, 2008 chair letter (doc. 38-7, PageID 1568-71), Brueggemeier's December 17, 2008 tenure letter (doc. 38-13, PageID 1858-59), and Anthony P. Young's December 9, 2008 P&T Committee Chair letter (doc. 38-12, PageID 1854-56).

Plaintiff's arguments regarding research, grant funding and publication record are summarized as follows.

Research funding sources. Plaintiff argues that Brueggemeier's four year review letter's "expectation" that Seoane secure research funding "from federal agencies (such as HHS, AHRQ, NIH or NSF) that involve standard peer-review processes . . . " (March 16, 2007 Letter from Dean Brueggemeier to Executive Vice President and Provost Barbara R. Snyder, at p. 3, Doc. 38-8, PageID 1573, 1575)

45

"duped" Alutto into falsely believing federal grant funding was appropriate for Seoane's focus and to deny tenure. (January 30, 2012 Memorandum Contra Defendant's Motion for Summary Judgment, Doc. 94, PageID 16368-69.) Plaintiff's brief argues that an OSU-HR investigator recommended changing the expectation that Seoane obtain federally funded grants to an expectation that he obtain "any competitive or peer reviewed funding . . . ." (January 5, 2009 Letter from Seoane to Brueggemeier, at p. 3, Doc. 38-14, PageID 1862, 1864.[18]) Seoane had the opportunity to include this argument in his January 5, 2009 letter to Brueggemeier raising this issue in the material submitted with his appeal to grant tenure. (Seoane's January 5, 2009 Letter to Brueggemeier, p. 9, Doc. 38-14, PageID 1862-1875; Plaintiff's Ex. 32, Seoane's Petition to OSU's Senate Committee on Academic Freedom, Docs. 52-29 and 52-30, PageID 4477-4634.)

Plaintiff also argues that other professors were granted tenure even though they did not obtain federally funded peer-reviewed grants. As an example, he cites Dr. Knoell. However, the citation to the record (Doc. 38-15, p. 4, PageID 2026[19]) does

----

[18]The investigator's report itself is not cited in Plaintiff's brief.

[19]This document appears to be the document Brueggemeier provided describing COP federal peer-reviewed funding that Plaintiff attacks as inaccurate. (Doc. 94, PageID 16368.) Plaintiff does not provide any information about when Dr. Knoell was granted tenure or what federally funded grants he obtained. He does offer a spreadsheet listing federal funding obtained by Professors A-E as principal investigators for the period 01/01/2002 -- 11/30/2008. (Doc. 39-19, PageID 3089-90.) The spreadsheet does not identify the professors, and Plaintiff does not cite deposition testimony identifying them. Further, the accuracy of the spreadsheet is called into question by Brueggemeier's assertion that he accessed the OSURF and found a grant to Pedersen not included in it. (Brueggemeier's December 15, 2011

not support that assertion. Similarly, plaintiff argues that Brueggemeier mis-represented that Associate Professor Craig Pedersen had a federally funded grant before he was granted tenure, citing Doc. 38-15, p. 4, PageID 2027 and Seoane's affidavit which asserts he researched OSURF's database and found it "completely devoid of the federal funding Brueggemeier claimed Pederson [sic] had."[20] (January 30, 2012 Affidavit of Enrique Seoane-Vazquez, ¶ 32[21], PageID 16455; Doc. 39-19, PageID 3089-90.) Plaintiff asserts that no professors in the Division obtained NIH funding in the six years preceding Seoane's petition for tenure and that his prin-cipal investigator gross dollar funding was the fourth highest of the six professors in the Division. (Doc. 94, PageID 16373.) Next plaintiff argues that the audiotape of the four year review of another professor held the same day as Seoane's tenure review proves that Seoane's Division did not expect that professor to obtain the same independent federal funding expected of him. (*Id.*, ¶ 33, PageID 16455.)

Finally, Plaintiff argues that Dr. Buerki's October 10, 2008 Chair letter statement that "[s]everal Division faulty members expressed concern that Dr. Seoane-Vazquez . . . has made little progress . . . securing peer-reviewed research funding from federal agencies . . . ." unfairly portrays his grant record. (Doc. 38-7,

---

Declaration, ¶ 6, Doc. 76-27, PageID 10861-62.)

[20]January 30, 2012 Memorandum Contra, Doc. 94, PageID 16368.

[21]Brueggemeier disputes Seoane's assertion that Pedersen had no federal grants. He was the co-principal investigator on a grant from the Center for Medi-care and Medicaid Services. (Robert W. Brueggemeier's December 15, 2011 Dec-laration, ¶ 6, Doc. 76-27, PageID 10861-62; Defendant's December 16, 2011 Motion for Summary Judgment, Ex. U, Doc. 76-23, PageID 10787-88.)

PageID 1569.)

Plaintiff generally asserts that Young's letter reporting the P&T Committee vote to deny tenure and Brueggemeier's letter recommending denial of tenure also criticize the gross dollar amount of Seoane's grant funding. Young's letter said "there were serious concerns expressed regarding his research." (December 9, 2008 Letter from Young to Brueggemeier, p. 1, Doc. 38-12, PageID 1854.) As examples, the letter reported that "some faulty and external reviewers suggest that Dr. Seoane-Vazquez had not demonstrated an ability to secure sufficient funding from competitive sources. Again, these concerns [which also included faculty and/or outside reviewers who viewed his publications as descriptive and lacking sufficient analysis, and/or his research as lacking focus] were not universally held by the faculty. However, they were likely to have been a major influence in reaching the final tally." (*Id.*, p.3, PageID 1855.) Brueggemeier's letter stated:

> Regarding sponsored research funding, Dr. Seoane-Vazquez has served as principal investigator on three small projects funded through OSURF and on five small projects from international organizations. The competitive nature of the funding for these projects is not clear. It is not clear that these projects do undergo the standard peer-review process of the federal agencies (e.g., NIH, ARHQ, NSF) or of many national foundations. The majority of the faculty, reflected in both the Division letter and the letter from the P&T committee, and several external evaluators concluded that Dr. Seoane-Vazquez had not demonstrated the ability to secure sufficient funding from competitive sources. I concur with this assessment.

(December 17, 2008 Letter from Brueggemeier to Alutto, p. 2, Doc. 38-13, PageID 1859.) While Plaintiff contests the validity of these criticisms, the letters do accurately set out the opinions expressed by some faculty and some external

48

reviewers.

Research. Plaintiff argues that Buerki's Chair letter, Young's letter reporting the negative vote of the COP Promotion and Tenure Committee, and Brueggemeier's letter recommending denial of tenure made inaccurate representations of Seoane's research, grant funding, and publication record that influenced Alutto to deny tenure.

Plaintiff's brief states that Buerki's chair letter "alleged Seoane's research was inappropriately 'descriptive.'" (January 30, 2012 Memorandum Contra Summary Judgment , Doc. 94, PageID 16372.) There is no such criticism in the letter by Buerki. He does accurately state:

> Several Division faculty members expressed concern that Dr. Seoane-Vazquez may not have developed a consistent research theme or focus in his research. They noted that he has made little progress publishing his research as first or corresponding author in high-quality journals and securing peer-reviewed research funding from federal agencies through OSURF as recommended by Dean Brueggemeier's fourth-year review letter.

(Doc. 38-7, PageID 1569.) Buerki's summary of the outside reviews by John Hay and David Kreling do accurately state that those two reviewers described his research papers as "descriptive" and lacking "critical analysis" or "good conceptual models." *Id.,* PageID 1570-71. However, Plaintiff argues that when outside reviewers criticized Dr. Pedersen's research as "descriptive," Dr. Nahata's Chair letter defended him by asserting that the research was published in referred journal and the "descriptive" publications were "leading to hypothesis-driven projects." (Seoane's January 5, 2009 Letter to Brueggemeier, p. 9, Doc. 328-14, PageID 1870.)

49

Publication. Plaintiff contends that Buerki's Chair letter, Young's letter reporting the negative vote of the COP Promotion and Tenure Committee, and Brueggemeier's letter recommending denial of tenure held Seoane to a double standard. For example, Brueggemeier's tenure letter reported that a concern regarding Seoane's publications was the

> rush of publications, i.e., 12 of the 15 papers were published in 2007 or 2008. Since his research does not require a significant lead time in preparation (such as starting a laboratory or running a clinical trial), one expects a steady flow of peer-reviewed research publications throughout the probationary period.

(December 17, 2008 Letter from Brueggemeier to Alutto, p. 2, Doc. 38-13, PageID 1859.) Plaintiff's brief asserts that Professor McAuley received tenure even though his publication record was at least as uneven and "rushed" as Seoane's. (January 5, 2009 Letter from Seoane to Brueggemeier, p. 9, Doc. 38-14, PageID 1870; Seoane's April 4, 2009 Complaint to the Committee on Academic Freedom and Responsibility, Docs. 52-29 and 52-30, PageID 4487[22].) While Plaintiff contests the validity

---

[22]Exhibit 21 is Chair Richard H. Reuning's October 3, 1997 Four Year Review letter for Assistant Professor James W. McAuley. It reads, in relevant part:
> Certainly ten peer reviewed publications, with seven of these being original research, is excellent scholarly productivity for a laboratory/ clinical scientist at this stage of career. Dr. McAuley has done an excellent job in publishing his Ph.D. research and extensions of that research in high quality journals (see p. 331). The weak area in the publication record is the work emanating from Professor McAuley's research program here at Ohio State, since only two review articles are associated with work originating at Ohio State. However, Professor McAuley has been very active in presenting his Ohio State research at national meetings as indicated in his list of abstracts (pp. 19-21), has submitted two research manuscripts and one review (OSU work), and has two manuscripts on OSU research in preparation (pp. 25-26).

and relevance of these criticisms, the letter does accurately reflect the opinions expressed by some faculty and some external reviewers; and it accurately states the underlying facts regarding when Seoane's articles were published.

Seoane argued to Alutto and the FHC that Buerki's Chair letter under re-ported his publications. ( Seoane's January 5, 2009 letter to Brueggemeier, pp. 11-12, Doc. 38-14, PageID 1872-73; Doc. 52-29, PageID 4489-90.) Seoane also provided Alutto with a list of seven positive comments from external reviewers that Buerki's Chair letter did not include. (Memo Contra, p. 82,  Doc. 94,PageID 16374; Seoane's January 5, 2009 letter to Brueggemeier, p. 10, Doc. 38-14, PageID 1871; Docs. 52-29, PageID 4488, and 52-30, Exhs. 22-24, PageID 4617-26.)

**Incident 5**: Plaintiff alleges that COP violated OSU rules by failing to pro-duce a letter from COPH or "collaborator letters" in his dossier.  However, there appears to be no genuine issue of material fact as to whether it was COPH's policy to provide assessments for outside faculty with unpaid COPH appointments.  The FHC report was accompanied by a number of emails from COPH faculty on this subject.  They demonstrate that when Nahata originally asked about obtaining a letter for Seoane's dossier, and later when FHC contacted COPH to confirm their

---

Perhaps an even more important indicator of future productivity of Dr. McAuley's research is the solid foundation that has been laid over the past three years by the collaborative group in the Comprehensive Epi-lepsy Program (see pp. 42-43 and p. 27). . . . The work of this group is only now beginning to reach the publication stage since many of the studies are long term in nature.

Doc. 39-19, PageID 3122.

policy, Dr. Dembe (chair of the division in which Seoane held his appointment) and Dr. Florentine (the dean) both confirmed that they did not supply such letters.[23] (Doc. Seoane Dep., Ex. B, October 29, 2009 Decision of CAFR's Fair Hearing Panel, p. 6 and Attachment 2, pp. 1-2, 70-18, PageID 9183 and 9190-91.)  Plaintiff also alleges that COP neglected to ask him to submit letters of support from collaborators.  He points to no rule or other evidence to suggest, however, that COP had any responsibility to affirmatively request that he supply these for the dossier.

Plaintiff attempts to re-frame Incident 5 as "COP and Buerki's failure to accurately present COP faculty, Alutto, and the UHC with a proper analysis of Seoane's accomplishments at OSU." (Memo Contra, p. 100, Doc. 94-1, PageID 16392.) Plaintiff argues that an accurate assessment could not be made without input from COPH. Seoane presented this issue to Alutto, advising him that he taught a class at COPH, served as a co-advisor for a COPH doctoral student, and has appointed a scholar at COPH's Center for HOPES. (Doc. 38-14, PageID 1871-72; Doc. 39-14, PageID 2999-3000.) Since those materials were presented to Alutto, he had the opportunity to independently review the issue. No action by Buerki or Brueggemeier interfered with Alutto's opportunity to conduct an independent

---

[23]  Plaintiff suggests – without presenting any evidence – that Dembe was lying about COPH policy in order to take revenge against Seoane for mentioning him in his original Title VII complaint, but he offers no theory as to why Florentine and the other COPH faculty might have done so.

For his part, Alutto asserted that "it has been my experience at OSU that college's [sic] in which a candidate has a 0% appointment rarely, if ever, provide such letters.  I did not find this to be unusual in any way in Dr. Seoane's case." (Alutto Declaration ¶ 13(e), Doc. 77, PageID 10873-74.)

review.

**Incident 6**: Plaintiff alleges that OSU's refusal to postpone his ballot meeting until after his Title VII claims were adjudicated was retaliatory. That Defendant followed its own rules and carried out its ordinary procedure cannot reasonably be said to have been retaliatory in itself. The University rules provide for how the tenure process will operate. *See* O.A.C. §3335-6-03(B)(1) (assistant professor reviewed for tenure no later than sixth year of appointment). Plaintiff argues that for OSU to go forward with a tenure review process tainted by retaliatory bias was evidence of retaliation, but this is simply circular logic. In addition, Plaintiff argues that OSU's refusal to agree to his demand that his tenure review be performed in some other college was a retaliatory act. He has pointed to no university rule providing for such a novel and extraordinary practice, or evidence that such a thing had ever been done before for any other tenure candidate.

Plaintiff attempts to re-frame this allegation of retaliation to include allegations that Defendant violated University rules by allowing Buerki writing the Chair letter, failing to take reasonable efforts to assure that COP's P&T Committee followed written procedures and carried out its review in a highly professional manner, and COP's failure to see that the P&T Committee members accepted personal responsibility for assuring that its review was correct, fair, and free of bias. (Memo Contra, pp. 105-06, Doc. 94-1, PageID 16397-98.) As an example, Plaintiff asserts that Alutto was led to believe that Nahata did not vote on Seoane's tenure. Yet both Nahata and Balkrishnan voted on Seoane's petition for tenure.

53

2.    **Causal Link**

The Court will now consider whether a reasonable juror could find by a preponderance of the evidence that, as alleged by Plaintiff in regard to these six incidents' Balkrishnan, Buerki, Nahata, and Brueggemeier's actions, motivated by a retaliatory animus, were a proximate cause of Alutto's decision to deny Seoane tenure.

a.    **Traditional Rule**

The underlying purpose of the cat's-paw doctrine is to recognize situations where an ostensible decision-maker has uncritically relied on recommendations, misinformation, or suggestions made by supervisors/coworkers who acted with retaliatory intent. However, courts have traditionally held that "when a decision-maker makes a decision based on an independent investigation, any causal link between the subordinate's retaliatory animosity and the adverse action is severed." *Roberts v. Principi*, 283 Fed.Appx. 325 (6th Cir. 2008).  In *Roberts*, an emergency room nurse was reassigned to a less desirable position after filing an EEOC complaint of sex discrimination.  The plaintiff argued that the medical chief of staff who had made the reassignment had done so merely because he had received petitions from the coworkers about whom she had complained, alleging that she was harassing her colleagues by filing false complaints.  The court noted that a cat's paw theory might have operated under these facts, except that before taking action the decision-maker had appointed two investigatory boards which gathered facts and interviewed witnesses.  This broke the chain of causality, because the chief of

54

staff rendered an independent decision – whether fair or unfair – based upon his own investigation, not in mere deference to subordinates with retaliatory animosity.

Under this rule, the investigation informing the employer's decision need not be extensive, so long as it is independent.  *See, e.g., Wilson v. Stroh Companies, Inc.*, 952 F.2d 942, 944 (6th Cir. 1992) (manager's interview of one witness about disputed facts sufficient to constitute independent investigation); *Willis v. Marion County Auditor's Office*, 118 F.3d 542, 546-47 (7th Cir. 1997) (employee's opportunity to explain herself to managers constituted independent investigation); *Llampallas v. Mini-Circuits Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998) (decisionmaker's interview with plaintiff before taking adverse action excepted case from "cat's paw" theory); *EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 488 (10th Cir. 2006) ("simply asking an employee for his version of events may defeat the inference" of discrimination); *Lyle v. The Cato Corp.*, 730 F.Supp.2d 768, 782-83 (M.D. Tenn. 2010) (decisionmaker's request for plaintiff's side of story broke chain of causation for cat's paw theory).

### b.   **Rule under *Staub***

The United States Supreme Court, in *Staub*, *supra*, retreated from this standard, finding that it was sufficient for a showing of cat's paw liability that supervisors' discriminatory acts be *a* cause of the ultimate action:

> Proctor suggests that even if the decisionmaker's mere exercise of
> independent judgment does not suffice to negate the effect of the prior
> discrimination, at least the decisionmaker's independent investigation

(and rejection) of the employee's allegations of discriminatory animus ought to do so.  We decline to adopt such a hard-and-fast rule.  As we have already acknowledged, the requirement that the biased supervisor's action be a causal factor of the ultimate employment action incorporates the traditional tort-law concept of proximate cause. . . . [T]he supervisor's biased report may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified.

. . .

[I]f the independent investigation relies on facts provided by the biased supervisor – as is necessary in any case of cat's paw liability – then the employer (either directly or through the ultimate decisionmaker) will have effectively delegated the factfinding portion of the investigation to the biased supervisor.

131 S.Ct. at 1193.  Accordingly, the existence of some kind of investigation is no longer, in and of itself, preclusive of a claim based upon cat's paw liability.

However, the Supreme Court adhered to the rule that:

[I]f the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action . . . then the employer will not be liable.

*Id.*

### c.  **Alutto's Investigation and Decision**

Plaintiff argues that Alutto relied on Brueggemeier and others for reliable information on which to base his decision to grant or deny tenure, but that they, with retaliatory animus, provided him with false information designed to cause him to deny Seoane tenure. Seoane concedes that he wrote to Alutto challenging the factual information he contends was erroneous and explaining in detail why it was not reliable. (Memo Contra, p. 87, Doc. 94-1, PageID 16739; Seoane's January 5, 2009 Letter to Brueggemeier, p. 9, Doc. 328-14, PageID 1862-1875; Plaintiff's Ex.

56

32, Seoane's Petition to OSU's Senate Committee on Academic Freedom, Docs. 52-29 and 52-30, PageID 4477-4634.) Although Plaintiff argues that "Alutto admitted that both he and the UPTC relied on the contents of Brueggemeier, Buerki and Young's letters" (Memo Contra, p. 86, Doc. 94-1, PageID 16378), his testimony was that he relied on those letters and "all the material" presented to them. (Alutto's Deposition, p. 26, ll. 12-3.)

Plaintiff argues that "Brueggemeier had a long history of retaliatory animus towards Seoane which triggered OSU-HR['s] recommendations mandating Brueggemeier not engage in retaliatory conduct toward Seoane." (Memo Contra p. 89, Doc. 94-1, PageID 16381.) However, there is no finding in Carmeen Yarbrough's March 1, 2006 final report of her investigation of Seoane's complaint of discrimination based on his national origin that Brueggemeier "had a long history of retaliatory animus towards Seoane" and no fact findings in that report that would support a conclusion that Brueggemeier had a retaliatory animus towards Seoane. Yarbrough's report found insufficient evidence to support each of Seoane's allegations that the University violated its non-discrimination policy. (Doc. 52-29, PageID 4497, 4501-09.) She did advise that PPAD faculty and Seoane should be warned that they were not to retaliate for statements gathered during the investigation. (*Id.*, PageID 4510.)

Similarly, on April 25, 2007, OSU-HR's outside consultant investigator Priscilla Hapner found that there was insufficient evidence to support Seoane's January 5, 2007 complaint that Brueggemeier and others had retaliated against

him from making earlier complaints of discrimination. (Doc. 52-29, PageID 4512-27.) She specifically found that Brueggemeier was not motivated by retaliation when he made the recommendations contained in his Seoane four year review letter. (*Id.,* PageID 4526.) She did require the Division to notify faculty that they could not retaliate against Seoane for causing the investigation. (*Id.*)

OSU-HR Employment Law & Compliance Manager Olga Esquivel-Gonzalez's July 3, 2007 letter to Brueggemeier regarding discrimination complaints filed by Seoane, Balkrishnan, Jessie Au, and Sheryl Szeinbach advised that Brueggemeier and all the complainants should be notified not to retaliate in any way regarding the investigation of the complaints. (Plaintiff's Ex. 285, pp. 1-4, Doc. 52-11, PageID 4380-83.) The letter contains no finding that Brueggemeier discriminated against Seoane or any of the other professors who filed discrimination complaints. Esquivel-Gonzalez did recommend that Brueggemeier

> assess Dr. Balkrishnan's behavior since the issuance of the cease and desist directive related to inappropriate interaction with students and determine the impact that such behavior will have on his performance evaluation and/or merit raise.

(*Id.,* p. 4, PageID 4383.)

Plaintiff argues that Brueggemeier's retaliatory animus is evidenced by his providing false and misleading information to Alutto and FHC and his failing to implement OSU-HR's recommendations that Balkrishnan be disciplined for retaliatory conduct toward Seoane. (January 30, 2012 Memo Contra, pp. 30-31, Doc. 94, PageID 16322-23.) Specifically regarding Balkrishnan, Plaintiff asserts that OSU-

HR investigator Carmeen Yarbrough's recommended that COP create a "perform-ance plan" for him to address his inappropriate actions toward Seoane and his students, document his compliance with the performance plan in Nahata's annual review of Balkrishnan, and document that corrective measures had been taken to stop the inappropriate actions of Drs. Pedersen and Schneider against Seoane and his students. Actually there is no reference to a performance plan in Yarbrough's recommendation. Instead, she recommend that Balkrishnan be prohibited from:

> directly contacting other faculty members' students regarding advising and working on projects with him. Additionally, Professor Balkrish-nan's behavior [regarding statements made to or in the presence of students] should be addressed as a part of his Annual Review letter.

(*Id.,* PageID 4511.) Nor is there any directive to take steps to stop inappropriate actions of Drs. Pedersen and Schneider against Seoane and his students.

However, the April 25, 2007 report of OSU-HR's outside consultant investi-gator Priscilla Hapner does recommend that a performance plan be developed for Balkrishnan. Her report "found no evidence that any criticism of Seoane-Vazquez were related to his national origin." (April 25, 2007 Hapner Letter to Mary Ionno, OSU Associate Legal Counsel, p. 9, Doc. 38-14, Ex. 3, PageID 1913.) She further found:

> [T]he evidence I received did not support Seoane-Vazquez's suspicions the division faculty are mere "pawns" for Nahata and/or Balkrishnan, or that their criticisms were based on his national origin or prior pro-tected conduct. Some of the faculty have formed independent criti-cisms."

(*Id.* Footnote omitted.) Hapner said that criticisms of Seoane-Vazquez predated his

initial charge. (*Id.*, pp. 10-12, PageID 1914-16.) Hapner then discussed the nature of the conflicts with the division:

> My investigation uncovered numerous conflicts between Seoane-Vazquez, Szeinbach and Balkrishnan over graduate students, etc. It is clear that they do not like each other and that Balkrishnan has advocated that he thinks that Seoane-Vazquez should leave the College. Unlike Seoane-Vazquez, who has mostly limited his personal criticisms of Balkrishnan to appropriate forums, Balkrishnan has made no secret of his disrespect for Seoane-Vazquez's scholarship and productivity.

(*Id.*, p. 12, PageID 1916.) Hapner believed that the more Balkrishnan spoke negatively of Seoane-Vazquez, the more he was losing the respect of other COP faculty "despite the fact that Balkrishnan publishes much more and receives more grant funding than other faculty in the division." (*Id.*) Consequently, she concluded that

> Balkrishnan's efforts to persuade his colleagues about Seoane-Vazquez have had no affect on them and, in fact, have lead him to be excluded from formally participating in any way in reviewing Seoane-Vazquez's performance and losing some respect from a few of his colleagues.

(*Id.*) Hapner found that "[r]egardless of whether criticism of the division faculty are fair or not, there is insufficient evidence that they were motivated by his national origin or protected conduct." (*Id.*)

After this discussion, Hapner made a "strong recommendation that Seoane-Vazquez be assigned a mentor," because he "should not be isolated and deprived of good advice while he is attempting to make tenure." (*Id.*, p. 13, PageID 1917.) Hapner further said that a "number of issues should be addressed," including faculty training on the professional and appropriate manner of communicating about students, a "performance plan" for Balkrishnan, and a "climate-review" for

60

the PPAD Division. (*Id.,* pp. 14-15, PageID 1918-19.) The performance plan for Balkrishnan was

> to help him improve his communication style, identify inappropriate comments and avoid making inappropriate comments which reflect poorly on his judgment and discretion. It might be worth finding and assigning a mentor for him as well as to discuss how he interacts with his students and other faculty, etc.

(*Id.,* p. 14, PageID 1918.) The climate-review would include *"Crucial Conversations"* training and possible team-building exercises in order to better focus on civil and professional discussions." (*Id,* p. 15, PageID 1919.)

The only evidence Plaintiff proffered about how COP responded to Hapner's April 2007 recommendations is Defendant's supplemental response to Plaintiff's Document Request No. 18. That request read: "All documents . . . relating to any disciplinary or corrective action taken by Defendant against Drs. Pedersen, Schneider, Balkrishnan, Brueggemeier, and/or Nahata for actions taken against Plaintiff from 2006 to present." Defendant's response was: "Defendant states that it has no responsive documents." (Memo Contra, Ex. G, Defendant's Supplemental Responses to Plaintiff's Document Requests, p. 6, Doc. 95-4, PageID 16514.) Thus Plaintiff has offered no evidence about what response, if any, COP made to Hapner's recommendation that Balkrishnan be given help to improve his communication skills, avoid inappropriate comments, and improve his interaction with students, faculty, and others. Her recommendation was not for "disciplinary or corrective action . . . against . . . Balkrishnan." So the document request simply failed to request the information Plaintiff now would like to present to the Court.

61

Plaintiff has proffered no evidence about how OSU responded to Hapner's report and the recommendations in it.

Although Plaintiff has proffered no evidence on COP's response to Hapner's recommendation, a word search of Balkrishnan's deposition revealed that he received a report from her setting out the issues she found regarding his conduct. (Balkrishnan Dep., p. 473, Doc. 62, PageID 6680.) Nahata met with Balkrishnan about the report and offered to work with him on the issues Hapner raised. Balkrishnan told him he would prefer an external coach. (*Id.*, pp. 474-76, PageID 6680.) Nonetheless, Nahata raised the issues regarding communications with faculty members with Balkrishnan after every meeting the two had about research. (*Id.*) Balkrishnan was never told he was on a performance plan. (*Id.*, p. 477, PageID 6681.) He did get a coach who was an outside consultant not on the faculty or staff of OSU. Balkrishnan spent 90 minutes a week with the coach. That coach made a report to the Dean. (*Id.*, p. 481and 483-84, PageID 6682.) Nahata confirmed Balkrishnan's testimony that he counseled him and that Balkrishnan had an outside coach. (Nahata Dep., pp. 98 and 293, PageID 4202 and 4251.) Neither the evidence proffered by Plaintiff nor the testimony set out above is evidence from which a reasonable trier of fact could conclude that Brueggemeier acted with retaliatory animus.

As evidence of Buerki's retaliatory animus, Plaintiff argues that although Buerki testified that in writing the Chair letter he made a list of the positive, neutral and negative comments of the reviewers so that he could present a balanced

focus to his summary of their comments (Buerki dep., pp. 157-58, Doc. 64, PageID 7057) and he testified that he found three external reviewers to be positive, two mixed, and two "definitely negative" (*Id.,* p. 1184, PageID 7165), neither his Chair letter nor his audiotape statements at the P&T Committee meeting suggested that three of the external reviewer letters were positive and two mixed. At the Committee meeting he merely stated "some [external reviews] are positive, some are negative, some I think are mixed." (Memo Contra, Ex. A, ¶ 34, Doc. 95-1, PageID 16455.) Plaintiff asserts that "Buerki clearly hid his belief" that three letters were positive from the faculty making the tenure vote. (Memo Contra, p. 91, Doc. 94-1, PageID 16383.) Even assuming Buerki did "hide his belief" about the number of positive, negative and mixed comments by external reviewers, that would have been consistent with his function as Chair of the P&T Committee to neutrally present the facts the Committee needed to inform its tenure vote. It is not evidence of retaliatory bias.

Next Plaintiff argues that Balkrishnan influenced the faculty tenure vote by shaping the false perception that "four out of the seven reviewers mention . . . serious concerns about the quality of research [Seoane had] published" and asserting that Dr. Kreling's evaluation found that Seoane's "body of scholarship is mediocre at best," and that four of the external reviewers "basically concur" with that opinion. (*Id.,* ¶ 34, PageID 16455.) Assuming without deciding that a fact-finder could conclude that Balkrishnan, acting with retaliatory animus, was attempting to shape a false impression about the opinions of the outside reviewers, the evidence is

63

irrelevant to Plaintiff's cat's paw theory because Alutto made the decision to deny tenure. He did not hear Balkrishnan's comments at the tenure vote meeting, and he read the reports from the external reviewers and had the opportunity to evaluate them for himself. As a tag along argument, Plaintiff asserts that Buerki never challenged Balkrishnan's statement set out above. Recognizing that each faculty member is entitled to his or her opinion about the suitability of a tenure candidate as a colleague and that Buerki's role was as Chair, not advocate for Seoane, a reasonable finder of fact could not conclude that Buerki's silence was retaliatory or that it caused Alutto to deny tenure without making his own, independent evaluation of the external reviewers' reports.

Plaintiff also has not presented evidence from which a reasonable juror could conclude by a preponderance that COP used bias external reviewers to cause the P&T Committee and, ultimately, Alutto to deny Seoane tenure. First, Seoane had the opportunity to suggest external reviewers and chose not to do so. (Alutto Declaration, Ex. C, p. 1, Doc. 77-2, PageID 11036.) Nothing in the process of selecting the external reviewers suggests a retaliatory animus. Buerki met with senior faculty members in the division who came up with a list of fifteen potential external reviewers. Although Nahata attended the meeting, he did not offer any names. Buerki sent requests to all fifteen. The list of potential external reviewer names was furnished to Seoane after COP sent the requests, and Seoane did not object to any reviewer. Plaintiff has offered no evidence that any external reviewer was, in fact, biased or otherwise unqualified to review his performance as an assistant

64

professor seeking tenure. Finally, Seoane told Alutto about his position that the external reviewers were biased, so the Provost had the opportunity to make his own decision independent of the representations made by Buerki, Nahata and Brueggemeier.

Similarly, Plaintiff's allegations that Alutto's decision was influenced by Brueggemeier's four-year review letter and an inaccurate representation of his research, grant funding and publication record in Buerki's Chair letter are not supported by evidence from which a reasonable juror could conclude by a preponderance that Buerki, Nahata, and Brueggemeier, motivated by a retaliatory animus, were a proximate cause of the Provost's adverse employment decision. Alutto had all the available information before him necessary for an independent evaluation of Seoane's research, grant funding and publication record.

Plaintiff argues that Alutto's affidavit claims that he conducted an independent review of Seoane's petition for tenure, including an independent review of Buerki's Chair letter and Brueggemeier's letter recommending denial of tenure are not credible and are contradicted by his own testimony and other evidence of record. (Memo Contra, p. 99, Doc. 94-1, PageID 16391.) This argument is not supported by the proffer of supporting evidence from which a reasonable trier of fact could conclude by a preponderance that Alutto's review and decision to deny tenure were a proximate result of retaliatory conduct by Brueggemeier, Nahata, and Balkrishnan.

Although Plaintiff that COPH's refusal to make an evaluation of Seoane's performance and qualifications for tenure was driven by a retaliatory animus

toward him, it has offered no evidence supporting that allegation. The uncontroverted evidence is that it was COPH's policy not to make such evaluations for professors seeking tenure in other divisions. There is no evidence that Buerki, Nahata or Brueggemeier played any part in COPH's decision not to provide an evaluation; and, in any event, Alutto had all the information necessary before him to independently determine what weight if any to give COPH's refusal to evaluate Seoane.

Plaintiff also argues that COP should have delayed his tenure review while litigation between him and OSU was ongoing. However, Plaintiff has offered no evidence from which a reasonable juror could conclude by a preponderance that the decision to go forward with the tenure review was motivated by a retaliatory animus. Similarly, his arguments that it was unfair for Nahata to allow Buerki to write the Chair letter and the P&T Committee did not carry out its review in a highly professional manner lack merit and would not support a finding of retaliation.

Assuming for purposes of decision only that Plaintiff has offered evidence from which a reasonable juror could find by a preponderance that the P&T Committee vote to deny tenure was made with retaliatory animus and that Brueggemeier, similarly motivated, recommended denial of tenure, Plaintiff has offered no evidence to rebut OSU's assertion that Alutto conducted an independent review of the dossier and other evidence presented to him and made his own decision to deny tenure. There is no evidence that Dean Alutto was motivated by a bias against tenure candidates of Hispanic national origin or that he was motivated to retaliate

against Seoane because he had made complaints of discrimination. The only basis Plaintiff asserts for liability is cat's paw liability. Here the report of the ballot committee meeting states that the grounds for denying tenure were:

- Depth of scholarship publications (merely descriptive and lacking sufficient analysis),

- lack of focus of the research, and

- failing to demonstrate an ability to secure sufficient funding from competitive sources.

The question for decision is whether Plaintiff has offered sufficient evidence for a reasonable trier of fact to find by a preponderance that Dean Alutto delegated fact finding on these grounds for denying tenure to coworkers and supervisors who were motivated by a retaliatory intent to deny Seoane tenure.

Provost Alutto did not merely evaluate Seoane's record himself, but also referred his tenure review to the FP&T. Both Alutto and the FP&T had available to them not merely the tenure dossier Plaintiff had prepared and the COP and faculty ballot meeting reports, but also Seoane's written Comments Letter. (Doc. 52-16 at 2.) Anderson, the convenor of the FP&T, reviewed Seoane's claims of bias and improper procedure, and met with Brueggemeier and university legal counsel for their opinions. She then, in her report to the Provost, set forth not merely a record of the FP&T's vote as to Seoane's qualifications, but a response to each accusation of impropriety. (*Id.* at 2-3.) Alutto, for his part, testified that he read and considered

Seoane's Comments Letter.[24] In addition to the Anderson's letter and the other information set out above, Alutto had Seoane's position about the retaliatory acts he alleged Brueggemeier, Nahata, and Balkrishnan engaged in and how they negatively impacted the FP&T Committee vote. (Seoane's January 5, 2009 letter to Brueggemeier, Doc. 21-3, PageID 411-25; his May 4, 2009 letter to Alutto, Doc. 24-1, PageID 811-25; and his June 15, 2009 letter to Blackwell, Doc. 25-2, PageID 973-83.)

Even under *Staub*, an independent investigation can still break a chain of proximate cause, if it "results in an adverse action for reasons unrelated to the supervisor's original biased action." *See Romans v. Michigan Dep't of Human Services*, 668 F.3d 826 (6th Cir. 2012) (decisionmaker who made independent investigation and concluded firing justified on other grounds broke causal chain). Here, the employment decision Alutto had to make was not whether to terminate Seoane for cause, but whether his work demonstrated that he was of sufficient caliber to become tenured faculty.  He testified that, in making Seoane's tenure decision, he had reviewed the materials in his dossier, consulted with Anderson, read her report of the FP&T's findings, and then made a tenure decision based solely on the record presented in the dossier.  (Doc. 38-1 at 6-7, 9, 27; Doc. 77 at 2-6.)  With respect to the incidents not dismissed above, Alutto states in his

---

[24]  Plaintiff does not dispute that Alutto considered his allegations.  *See* Doc. 94 at 41 fn 147, identifying Seoane's comments letter "which Alutto reviewed in evaluating Seoane's Retaliation Incidents").

declaration that he discounted Seoane's allegations of bias because he found the external reviewers' letters were consistent with his dossier, that the criticisms of Kreling and Gaither were "similar to ones I had when I reviewed the core dossier," and that the characterization of Seoane's record in the Chair Letter, Dean's Letter, and ballot meeting report was supported by his academic record.  (Doc. 77 at 4-5.) Having considered these matters, he "determined that, in my opinion, Dr. Seoane's academic record did not meet OSU's standards for awarding him tenure and, thus, I decided not to award him tenure." (*Id.* at 6.)

In *Rajaravivarma v. Bd. of Trustees for Connecticut State Univ. System.*, __ F.Supp.2d __, 2012 WL 1019877 (D.Conn. Mar. 26, 2012), another district court recently addressed a Title VII discrimination claim by a professor who relied on the cat's paw theory of liability by offering evidence that two colleagues who made negative tenure recommendations. The university's president, the ultimate decision-maker, testified that he reviewed the candidate's tenure portfolio in order to determine whether he independently concurred with any recommendations in the file. The *Rajaravivarma* court found, applying *Staub*, that this was an investigation breaking the causal chain:

> A reasonable juror could not conclude that Dr. Tracey's or Dr. Zanella's recommendation were the proximate cause of President Miller's decision to deny tenure where there is overwhelming evidence that President Miller's conclusions were based on his own prior independent assessment of the underlying portfolio submitted by Rajavivarma.  Since President Miller engaged in an independent investigation and independently assessed the underlying student evaluations and Rajavivarma's academic publications a reasonable juror could not conclude that Dr. Tracey or Dr. Zanella's

recommendations proximately caused his decision.

. . .

This is simply not the case, envisioned by the Supreme Court, where the independent investigation took the supervisor's allegedly biased report into account without determining that the adverse action was entirely justified apart from that supervisor's recommendation.

*Id.* at *28. The facts here are similar. Defendant has offered uncontroverted evidence that Provost Alutto conducted an independent investigation, which included an examination of Seoane's allegations about the retaliatory animus of Brueggemeier, Nahata, and Balkrishnan, that broke the chain of proximate cause. On the evidence proffered by Plaintiff, a reasonable juror could not conclude by a preponderance that Alutto made his decision by uncritically relying on the actions and recommendations of Brueggemeier, Nahata, and Balkrishnan, motivated by their retaliatory animus, to cause OSU to deny Seoane tenure.

Plaintiff nevertheless presents two arguments supporting his assertion that Provost Alutto could not have performed a legitimate independent investigation.

### I.    **Alutto's Ability to Review Seoane's Dossier**

Plaintiff's first argument is that Alutto was essentially unqualified to consider his record:

Moreover, attempts in Alutto's affidavit. . . alleging Alutto carefully reviewed Seoane's dossier directly contradict at least three statements Alutto made at his deposition: (1) Alutto never read Seoane's publications but rather relied on the external reviewers letters "and the assessments of faculty within" COP in order to form his opinion regarding those publications, (2) Alutto admitted having no personal knowledge of Seoane's area of expertise; and (3) Alutto acknowledged

70

> consulting no Independent Third-Party[25] with expertise in Seoane's
> academic discipline prior to denying Seoane tenure.  Therefore,
> Alutto's affidavit testimony regarding his alleged careful review of
> Seoane's dossier lacks merit.

(Memo Contra, pp. 38-39, Doc. 94, PageID 16330-31.)  This is not a colorable

argument.  Alutto testified that, before becoming provost, he was dean of the Fisher

College of Business, and noted that OSU has fifteen deans.  (Alutto Dep., pp.8 and

36, Doc. 38-1, PageID 1276 and 1283.)  Some sense of the breadth of academic

activities at OSU is conveyed by the FP&T, whose committee members included

faculty in the fields of dentistry, English, biology, economics, agriculture, mech-

anical engineering, medicine, and dance.  (Nahata Dep., Ex. 380, Doc. 52-16,

PageID 4422.)  It is self-evident that no one provost could have the professional

expertise to assess the tenure candidacy of all possible faculty on the strength of his

own personal knowledge, or to read and assess the professional merits of all poss-

ible candidates' publications.  If taken at face value, Plaintiff's argument is that

OSU's system of giving authority to the provost to make final tenure decisions is

inherently unfair or arbitrary, but this is a contention far outside the scope of a

claim that its application in one case was retaliatory.

## ii.  **Proposed Expert Testimony**

Plaintiff's second argument is that his expert witness, Dr. Stephen W.

---

[25] Plaintiff's use of capitalization in referring to a hypothetical "Independent Third-Party" consultant implies that it is a term of art in the university rules or elsewhere, but he has made no citation or other indication that such a formal role or procedure exists or has ever been employed.

Schondelmeyer ("Schondelmeyer"), can testify that Alutto's decision-making process must have been tainted by being supplied false information. (Doc. 104-3.) Schondelmeyer is a professor in the College of Pharmacy at the University of Minnesota, with expertise in the same academic specialty as Seoane. In this matter, he proposes to offer expert testimony on Seoane's qualifications relative to other persons granted tenure at COP, as well as:

> Whether or not inconsistent, inaccurate, misleading or false information more likely than not substantially contributed to the recommendations of the OSU Provost Alutto and/or the OSU University Hearing Committee (UHC) that Dr. Enrique Seoane-Vazquez not be awarded tenure.

(Schondelmeyer Dep., Ex. K, p. 4, Doc. 75-3, PageID 9888.) In other words, Schondelmeyer proposes to testify as an expert as to why Alutto and the FHC[26] reached the conclusions they did.[27] He states that his opinions are based upon

---

[26]Plaintiff's counsel and Plaintiff's expert consistently refer to the FHC Hearing Panel as the UHC.

[27] The Federal Rules of Evidence provide:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

F.R.E. 702.

"experience with the academic governance process," review of certain deposition transcripts and exhibits, and review of a recording and transcription of Seoane's tenure ballot meeting.

Schondelmeyer addresses at length the quality of Seoane's publications, the likelihood that a professor in Seoane's position could obtain NIH or other federal grant funding, and the nature and impact of various comments at the ballot meeting.  Given all this, he concludes:

85.  Based on my review of the aforementioned documents, inconsistent, inaccurate, misleading, and/or false information regarding Dr. Seoane-Vazquez more likely than not influenced Provost Alutto and the UHC to recommend Dr. Seoane-Vazquez not receive tenure at OSU.  Evidence supporting this opinion includes my findings and opinions as cited throughout this report.

86.  The deposition testimony of Provost Alutto and Dr. Threlfall show that both Provost Alutto and the UHC: (a) lacked the professional experience in Dr. Seoane-Vazquez' area of expertise to evaluate the accuracy of information contained in Dr. Seoane-Vazquez' dossier, and (b) they rendered tenure decisions based on essentially the same information provided to College faculty members voting on Dr. Seoane-Vazquez' tenure review.

87.  The deposition testimony of Provost Alutto and Dr. Threlfall establish that even though Provost Alutto and the UHC acknowledge Title VII retaliation could have negatively impacted the College's vote for Dr. Seoane-Vazquez being recommended for tenure, Provost Alutto and the UHC rendered tenure decisions without sufficiently evaluating how Dr. Seoane-Vazquez' Title VII activities adversely impacted his denial of tenure.

88.  The deposition testimony I reviewed shows that Provost Alutto, and the UHC, were inaccurately led to believe: (a) that the College required tenure candidates to obtain independent federal funding prior to receiving tenure; and (b) that the College required tenure candidates to obtain federal funding as part of an evolving tenure standard within the College.

. . .

91.  Based on my review of the aforementioned documents, inconsistent, inaccurate, misleading, and/or false information regarding Dr. Seoane-Vazquez more likely than not adversely influenced Provost Alutto and the UHC to recommend Dr. Seoane-Vazquez not receive tenure at OSU.  Evidence supporting this opinion includes my findings and opinions as cited throughout this Report.

(*Id.,* pp. 21-23, Doc. 75-3, PageID 9905-07.)

In *Berry v. City of Detroit*, 25 F.3d 1342 (6th Cir. 1994), the United States Court of Appeals for the Sixth Circuit reviewed a police shooting case in which the plaintiff called at trial an expert who purported to offer an opinion that Defendant's actions in failing to properly train its police officers constituted "a pattern of gross negligence" and "deliberate indifference".  *Id.* at 1353.  The appellate court sharply criticized the trial court's actions in permitting this testimony, finding:

We also believe the testimony was received in violation of the Federal Rules of Evidence.  Although an expert's opinion may "embrace[] an ultimate issue to be decided by the trier of fact[,]," Fed.R.Evid. 704(a), the issue embraced must be a factual one.  The expert can testify, if a proper foundation is laid, that the discipline in the Detroit Police Department is lax.  He could also testify regarding what he believed to be the consequences of lax discipline.  He may not testify, however, that the lax discipline policies of the Detroit Police Department indicated that the City was *deliberately indifferent* to the welfare of its citizens.

It would have been easy enough for the drafters of the Federal Rules of Evidence to have said that a properly qualified expert may opine on the ultimate question of liability.  They did not do so.  When the rules speak of an expert's testimony embracing the ultimate issue, the reference must be to stating opinions that suggest the answer to the ultimate issue or that give the jury all the information from which it can draw inferences as to the ultimate issue.  We would not allow a fingerprint expert in a criminal case to opine that a defendant was guilty (a legal conclusion), even though we would allow him to opine

74

that the defendant's fingerprint was the only one on the murder weapon (a fact). The distinction, although subtle, is nonetheless important.

. . . If the rule were [otherwise], we would soon breed a whole new category of "liability experts" whose function would be to tell the jury what result to reach – exactly what the expert did here.

(*Id.* at 1353-1354, emphasis in original.)[28]

Schondelmeyer might provide expert testimony about the nature and quality of Seoane's publications, about what kinds of grant funding are available in Seoane's field and who is likely to obtain them, or perhaps even about the tenure process in general for professors of pharmacy. He cannot, however, testify as an expert on what Provost Alutto thought. The only person qualified to do so is Provost Alutto. "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." F.R.E. 703. It is the province of witness examination to suggest to the jury that the witness surely must have been swayed by some consideration, that he is not credible or greatly deceived if he claims otherwise, and that if he reached some conclusion in spite of certain facts he must have been duped or incompetent. It is not, however, for an expert to assure the finder of fact that he can say to a reasonable degree of certainty what other people must have believed. Were it otherwise, any case of discrimination or retaliation could simply turn into a battle of experts proffering competing assurances

_____

[28] The *Berry* court found the trial court's error in permitting this expert testimony so substantial that it reversed the jury's verdict in favor of the plaintiff and remanded for entry of judgment as a matter of law in favor of the defendant. *Id.* at 1356.

about the hidden motivations of the parties involved, or a ludicrous duel of testimony between X and an X's-opinions expert. *See Shahid v. City of Detroit*, 889 F.2d 1543, 1547-48 (6th Cir. 1989) (expert testimony not admissible under Rule 704 where it would confuse the jury to hear opinion on ultimate facts they should determine based on credibility of testimony), citing *United States v. Zipkin*, 729 F.2d 384, 387 (6th Cir. 1978).

This report, were it accepted at face value, would offer the finder of fact not merely evidence of facts (inaccurate information was presented to Provost Alutto and the FHC Hearing Panel), but assurances as to the legal conclusions to be drawn from them ("inconsistent, inaccurate, misleading, and/or false information regarding [Plaintiff] *more likely than not* adversely influenced Provost Alutto and the [FHC] to recommend" denial of tenure). In other words, it would instruct the jury to find that Plaintiff had satisfied the element of a cat's paw liability claim – that the actions of Seoane's coworkers were proximately responsible for Alutto's ultimate decision.

The expert report would also opine that Alutto and Threlfall's deposition testimony "establish" that Alutto failed to sufficiently consider whether he might have been swayed by biased information from subordinates – that is, that no proper independent investigation broke the chain of cat's paw liability. (Doc. 104-3 at 25.) This is an example not of an expert using his "scientific, technical, or other specialized knowledge" to "help the trier of fact to understand the evidence or to determine a fact in issue," but of an expert attempting to instruct the trier of fact

76

what legal conclusions it should draw. An expert witness cannot testify as to what elements of a claim deposition testimony "establishes," but only as to what conclusions he has drawn from that information due to his particular ability to comprehend or analyze it. F.R.E. 702(a).

The decision whether to admit or exclude expert testimony ultimately turns on whether such testimony would be helpful to the trier of fact. *Heflin v. Stewart County, Tenn.*, 958 F.2d 709 (6th Cir. 1992). However, expert testimony "which attempts to tell the jury what result to reach. . . hardly can be viewed as being helpful to the jury." *Woods v. Lecureux*, 110 F.3d 1215, 1221 (6th Cir. 1997). The Court accordingly disregards Schondelmeyer's report to the extent that it is intended to establish or demonstrate genuine issues of material fact with respect to the question of cat's paw proximate causation. *See Cutlip v. City of Toledo*, – Fed.Appx.–, 2012 WL 25880818 at *11 (6th Cir. July 5, 2012) ("Here, [the expert] identified the precise legal standard relevant to this case and claimed that in his opinion the police had displayed this mental state. This is an improper legal conclusion and would not be admissible at trial; accordingly, we will not take this opinion into account when making our summary judgment determination"); *DeMerrell v. City of Cheboygan*, 206 Fed.Appx. 418, 426 (6th Cir. 2006) (proper for district court to ignore expert opinion that merely expresses legal conclusions).

VI.     **Conclusions**

Upon closer examination, Plaintiff's *prima facie* case that Alutto was influenced by the retaliatory bias of Seoane's supervisors and coworkers amounts to

little more than a list of accusations that his colleagues failed to advocate for him, to present his record in the best possible light, or to defer to his explanation of events.  Although on summary judgment the Court is to view all disputed facts in the light most favorable to the nonmoving party, the Court is not obligated to uncritically defer to the nonmovant's interpretations or theories as to the cause of events.  The Court may not simply assume that the innocent explanation as to any disputed episode is the correct one, but the nonmovant must present evidence to demonstrate that there *is* any other explanation.  Much of Plaintiff's briefing is a farrago of accusations that "COP was stacking the deck against Seoane" (Doc. 94 at 73), that any dispute as to his version of events or attempt by any colleague to explain himself constituted an attempt to corrupt the tenure process, and that any failure on the part of a decisionmaker to uncritically accept his position was simply proof that they were deceived.

Put simply, in this matter Seoane had his say.  He assembled his dossier, declined to suggest external reviewers who might be sympathetic to him, and submitted a comments letter which identified and addressed in detail his claims of unfair treatment.  Provost Alutto acknowledged and considered Seoane's arguments for his case, as did the advisory panel he convened.  Seoane was not believed, or his claims were not found serious enough to undermine the validity of the tenure process.  Whether or not supervisors and coworkers took adverse actions intended to cause Seoane to be denied tenure, Plaintiff has failed to offer evidence from which a reasonable juror could conclude by a preponderance that Provost Alutto's

78

decision was not based upon an independent investigation and evaluation of his academic record or that retaliation by Seoane's supervisors and coworkers was a proximate cause of the adverse employment action.

For the reasons set forth herein, Defendant's motion for summary judgment (Doc. 76) is **GRANTED**.  The Clerk of Court is **DIRECTED** to enter judgment in favor of the defendant and to close this case.

s/Mark R. Abel
United States Magistrate Judge